GEORGE J. LYTLE, Appellant, *v.* ALEXANDER BEVERIDGE, Respondent.

EDWIN S. PRINDLE, Appellant, *v.* THE SAME, Respondent.

In construing the autographic will of an illiterate person, it is the duty of the court to search for and give effect to the intent as it is made to appear from the body of the instrument, read in the light of the surroundings and relations of the testator, disregarding as far as may be technical rules of construction, and also the usual technical meaning of words and phrases, when contrary to the intent as thus disclosed.

The will of I., who died in 1823, contained a devise to his son J. of certain real estate "during his natural life, but if he leave no legitimate heirs," then the property to "revert back" to his son D., his heirs and assigns. I. died, leaving six children. A clause in the will expressed the testator's purpose to divide his property among his children. No other provision was made for D., while provision was made for all the others. By another clause D. was required to pay a grandson of the testator twenty dollars, "when he enjoys my homestead, as specified." J. had been married many years, and had no children. Provision was made for his wife, in case she survived him. In an action of ejectment brought by devisees of J., *held*, that the meaning of the testator, in the use of the words "if he leave no legitimate heirs," was, if he leave no children born in lawful wedlock living at the time of his decease; that the words "legitimate heir," as used, were words of purchase, not of limitation, and, therefore, that the rule in *Shelly's Case* did not apply; that the devise was to J. for life, with a remainder to D., in fee, contingent upon the death of J. leaving no child surviving; and this contingency having happened, that D. took an absolute fee.

J. was appointed by the will and qualified as executor. Sufficient personal property came to his hands to pay the testator's debts, and among them a judgment against him. J. allowed the lands so devised to be sold on an execution issued upon said judgment, bid in the same, and took a sheriff's deed. *Held*, that this was a breach of duty, and a violation of the fiduciary relations existing between him and the devisees, and that he took no title under the deed, but held the title thereunder for the benefit of and in trust for the devisees entitled.

One charged with the duty of protecting or caring for property, as executor, trustee, agent or otherwise, cannot deal with or become the purchaser of it for his own advantage, and to the prejudice of those whom he represents.

J. died, leaving a will, by which he devised the lands in question to his wife for life, remainder, in specified portions, to the plaintiffs herein. D. took a quit-claim deed from the widow. *Held*, that this did not estop D. or defendant claiming under him from asserting a title adverse to that of J.

(Argued October 6, 1874; decided November 10, 1874.)

APPEAL from order of the General Term of the Supreme Court in the third judicial department, reversing judgments in favor of plaintiffs entered upon the reports of a referee, and granting new trials. (Reported below, 7 Lans., 225.)

These were actions of ejectment, to recover possession of premises situate in Washington county. Each plaintiff

claimed a separate portion of a farm in possession of defendant, and the actions were tried together.

The farm in question was formerly owned by Isaac Lytle, who died in 1823 seized thereof, leaving a will, written by himself, and executed about six months prior to his death. The following are the principal clauses of the will:

"*Fourthly.* I allow my son Joseph to possess by devise of will the farm I now live on, it being No. three in John Morrin Scoots & John Taber Kemp's Patent of Partition lying and being in the Town of Hebron County of Washington and State of New York, with all the rights and privileges thereunto belonging as fully and freely as if I had made him lawful conveyance by full covenant during his natural life, but if he leaves no legitamate heirs then in that case the property according to my will I allow to revert back to my son David, his heirs or assigns forever without hindrance of any person whatsoever as freely and fully as if I had given him a lawful conveyance, Also the farm David L. Lytle now lives on adjoining George Webster's farm it being a part of Lot No. twenty-three in the aforesaid patent by estimate contains one hundred and seven acres, I lave to his son Emet Lytle when he comes to the age of twenty-one years to be his by devise of will forever. I also leave Joseph's wife ten acres with the house and barn her lifetime, in case she lives the longest. I also leave to my three daughters to wit Hannah Stewart, Nancy McAulsteer and Elizabeth Prindall what land may be unsold in the Town of Massena after my death to be divided equally, to be for their own soport and under their control no person having any power to controll them, this is all my own property, I by the blessing of God by my own industry, and now divide between my own children accoording to my own will and pleasure, I allow of no measures to be taken to prevent it. I allow my grandchild Isaac McAulsteer by devise of will to inherit that farm that Joseph now lives on except what is allowed to support Joseph's wife her lifetime then the said Isaac after her death becomes sole heir of the part allotted her.

" My personal property I come now to divide, I allow my granddaughter Agnes Lytle, I allow to have my clock as a token of respect. The child called George I allow twenty dollars to be paid to it by my son David when he enjoys my homestead, as specified above, then to pay that sum. I allow my son John D. Lytle the use of fifty acres of land to be laid out for me by the executors of Jeremiah V. Ransselaer for his suport while he lives, and then to revert to his son George forever. I leave also my son John D. Lytle a deed of three hundred acres of land left to me by father John Lytle in Mobles Borow, which land I never saw. I enquired of John Savage the Controller if there was any taxes returned on it, he made search and found none so that John may carry the deed and look up the number specified in the deed. I allow my devise of will to be a devise to him forever. I hereby appoint John Moodie one of my executors and Alexander McNisch the other and my son Joseph the third to see this will justly executed as far specified in this instrument. My personal property I alow my wife to divide as she shall think proper. And having disposed of my property according to my mind and will revoking any former wills heretofore made I alow this to be the last and standing will."

The farm in question is the one first described. The testator left personal property to the amount of about $1,000. Letters testamentary were issued to the executor named. The children mentioned in the will were living at the testator's death. Joseph took possession of the farm immediately after his father's death and occupied it until his own death in 1829. There was an outstanding judgment against the testator at the time of his death upon which executions had been issued and the said farm was sold thereunder, by the sheriff of Washington county, after the testator's death and while Joseph was in possession. He purchased the lands at the sale and took the sheriff's deed thereof. Joseph left a will, in and by which he devised the farm to his wife Cornelia for life; remainder to the plaintiffs herein in specified portions. Said Cornelia Lytle went into possession after her husband's

decease, and in March, 1829, by quitclaim deed, conveyed her interest in the premises to said David L. Lytle, who conveyed the same to the defendant and one John Beveridge. The latter subsequently conveyed his interest therein to defendant. Further facts appear in the opinion.

The referee found, as conclusions of law, in each case, that the will of Isaac Lytle gave an estate tail to Joseph, which, by force of the statute, became an absolute fee. That the will of Joseph gave to plaintiff the fee of the portion claimed by him after·the death of Cornelia, and that plaintiff was entitled to judgment awarding possession, etc.

*M. Schoonmaker* for the appellants. Under the will Joseph received an estate in fee simple absolute in the farm, and the subsequent devise to David was inoperative and void. (Fearne Ex. Dev., 179 ; 6 Cruise Dig., 277, § 18 ; *Chrystie* v. *Phyffe,* 19 N. Y., 344, 355 ; *Patterson* v. *Ellis,* 11 Wend., 293 ; 3 R. S. of 1830, p. 568, revisers' notes ; 1 R. S. of 1802, chap. 12, § 1, p. 44 ; 2 Jar. on Wills, 495 ; 1 id., 447 ; 10 J. R., 15 ; 11 Wend., 293 ; 18 J. R., 368 ; 9 Co., 127 ; Cro. Jac., 448 ; 1 P. Wms., 663 ; 5 T. R., 335 ; 2 Mum., 479 ; 2 285, Dessau., 94 ; 16 J. R., 406, 408, 411, 420, 423 ; 11 Wend., 288–290 ; 2 Jar., 247, 441.) The words "legitimate heirs," as used in the will, are words of limitation and not of purchase and signify heirs of the body. (*Bundy* v. *Bundy,* 38 N. Y., 410 ; 4 Kent's Com., 227, 229, 230 ; *Royall* v. *Eppes,* 2 Munf., 479 ; *Hunter* v. *Haynes,* 1 Wash., 71 ; Bro. P. C., 450 ; 2 Jar., 200 ; *Patterson* v. *Ellis,* 11 Wend., 260, 279 ; *Ide* v. *Ide,* 5 Mass., 500.) The words in the will "if he leaves no legitimate heirs" mean an indefinite failure of issue. (*Patterson* v. *Ellis,* 11 Wend., 260, 279 ; *Rathbone* v. *Dyckman,* 3 Paige, 9 ; *Ide* v. *Ide,* 5 Mass., 500 ; *Tenny* v. *Agar,* 12 East, 252 ; *Shifford* v. *Ormsby,* 3 Atk., 282 ; *Daintry* v. *Daintry,* 6 T. R., 313 ; *Forth* v. *Chapman,* 1 P. Wms., 664 ; *Wilson* v. *Wilson,* 32 Barb., 328, 332 ; *Wilkes* v. *Lyon,* 1 Cow., 333, 397 ; *Anderson* v. *Jackson,* 16 J. R., 382.) In the construction of wills the testator's intent is to

be ascertained from the terms of the will, and technical terms and phrases are to receive their legal and established meaning unless qualified and explained. (*Campbell* v. *Rawdon*, 18 N. Y., 412; *Harvey* v. *Olmstead*, 1 id., 489; *Patterson* v. *Ellis*, 11 Wend., 293; *Ide* v. *Ide*, 5 Mass.; 501.) The construction of a will is not to be controlled or affected by any thing that may occur after the testator's death. (*Jackson* v. *Bellinger*, 18 J. R., 368, 381.) If Joseph took only a life estate, then no estate or interest could arise to his children under the will. (Powell on Dev., 199; *Duffield* v. *Elwis*, 1 Sim. & Stu., 544; *Chapman* v. *Brown*, 3 Burr., 16, 26; *Walker* v. *Parker*, 13 Pet., 173; *Anson* v. *Anson*, 3 Den., 458, 461; *Atty.-Gen.* v. *Bailey*, 2 Bro., 553–570; 10 J. R., 15.; *Campbell* v. *Rawdon*, 18 N. Y., 412, 420.) The statute of limitations or adverse possession for twenty years cannot affect the right of recovery in this case. (*Jackson* v. *Schoonmaker*, 4 J. R., 390; *Jackson* v. *Sellach*, 8 id., 263; *Jackson* v. *Johnson*, 5 Cow., 74; *Constantine* v. *Van Winkle*, 6 Hill, 177, 193.) The conveyance by the widow of Joseph was good only as a conveyance of her life estate. (1 R. L. of 1813, chap. 169, § 1; *Jackson* v. *Walker*, 7 Cow., 637; *Finlay* v. *Cook*, 54 Barb., 10, 26.)

*M. Fairchild* for the respondent. The will did not, in form or effect, create an estate tail. (2 Bl. Com., 379–382; 1 Wash. on R. P., 72, § 22; 1 Jar. on Wills, 170 [232]; 2 id., 300 [418].) The word "legitimate" used in the will before the word "heirs" shows that the word heirs was used as synonymous with the word children, a word of purchase. (*Murphy* v. *Harey*, 4 Edw., 131; 2 Atk., 211; 7 Bing., 226; 11 Sim., 41; 4 Paige, 293; 1 Bradf., 314; 3 Wend., 503; 17 N. Y., 344.)

Allen, J. The plaintiff and defendant claim title from a common source, under the will of Isaac Lytle, who died in March, 1823, having made his will about six months before his death. The rights of the respective claimants to the

premises in dispute, depend upon the construction of the autographic will of a very illiterate man, ignorant not only of the several recognized estates in land, and of the technical rules relating to them, and the words necessary or appropriate to their creation, but also of the orthography and structure of the English language.

Of such a will, above all others, is it the duty of the court to be astute in discovering and giving effect to the actual intent of the testator, as the same may be spelled out from the body of the instrument, read in the light of the surroundings and relations of the author, and the circumstances in which he was placed, and, so far as may be, unembarrassed by technical rules of construction. The intent is to be gathered from the will, and not the subject of conjecture, and words which have acquired a fixed legal meaning must be intended to have been used in the sense which has been impressed upon them, unless it is apparent that they were used by the testator in a different sense. A devise is always most favorably expounded to carry out the intent and give effect to the will of the devisor, who, *inops consillii*, preparing his own will, omits or misapplies the legal and proper phrases. The doctrine that the intent of a testator is the guiding and controlling rule of interpretation requires, not unfrequently, a disregard of the usual technical meaning of words and phrases, and when necessary such technical meaning must yield to the evident intent of the testator. (*Hall* v. *Warren*, 9 H. of L. Cases, 420 ; 2 Bl. Com., 380, 381 ; *Paterson* v. *Ellis*, 11 Wend., 259, 293 ; *Chrystie* v. *Phyfe*, 19 N. Y., 344 ; *Young* v. *Robertson*, 4 Macq. H. of L. Cases, 314, 325.)

Rules of construction are resorted to as helps or aids, in arriving at the intent of a testator, and ought not to be followed when they lead to results subversive of such intent. There is no rigid rule of law to the effect that words shall only be used in one certain sense, or requiring courts to give language the same interpretation and effect, under all circumstances and in every connection. The infinite variety of circumstances that may occur, distinguishing one case from

another, in the use of the same words and phrases, renders it impossible to give an absolute and unbending rule for the interpretation of language applicable to all cases. Mr. Chitty, in commenting on *Perrin* v. *Blake* (4 Burr., 2579), says, that : " To argue that the intention shall be frustrated by a rule of construction of certain words, is to say that the intention shall be defeated by the use of the very words which the testator has adopted as the best to communicate his intention, and of which the sense is intelligible to all mankind." (2 Bl. Com., 381, note.)

The plaintiffs claim the benefit of the rule in *Shelly's Case* (1 Coke, 93, *b*), which, upon very subtle and artificial reasoning, held the doctrine that, when an estate of freehold is limited to a person, and in the same instrument there is a limitation either mediate or immediate to his heirs, or the heirs of his body, the word heirs is to be taken as a word of limitation, or, in other words, the ancestor takes the whole estate ; if the devise be to the heirs of his body, he takes a fee tail ; if to heirs generally, a fee simple. This is said to be a rule of law and not of construction, and Mr. Hargrave considered that it was so absolute and peremptory in its obligations, that it was beyond the control of intention when a fit case for its application existed. (4 Kent's Com., 226 ; 2 Powell on Devises, 429 ; *Brant* v. *Gelston,* 2 J. Cas., 384.) By the rule, an estate for life is raised by implication to an estate of inheritance, and either an estate tail, or in fee simple, depending upon the words of succession used in the deed or will, is made to vest in the first taker. It was not at first supposed that an express estate for life could be thus enlarged, on the ground that implication could only be admitted in the absence of, but not in contradiction to, an express limitation, but it was soon held otherwise, and an estate tail raised in the first taker by implication, upon a devise expressly for life. But this was in cases where the intention of the testator was manifest that the estate should not go over until the whole line of his issue was extinct, thus basing the rule upon the supposed intent of the

testator. (*Bamfield* v. *Papham*, 1 P. Wms., 54; *Attorney-General* v. *Sutton*, id., 754; *Langley* v. *Baldwin*, 1 Eq. Cas. Ab., 185, cited 1 P. Wms., 759; 1 Prest. on Est., 540, 602.)

So far as the rule confers upon the tenant for life or first taker the power to disappoint the successor, either by alienating the fee or barring the entail, it necessarily, in a great majority of cases, defeats the intention of the testator. In the cases in which the question has arisen, the testator has not intended that the tenant for life, to whose heirs or the heirs of whose body the remainder is limited, should have power to defeat the succession to them by an alienation to their prejudice. A distinction has been suggested between the intent of the testator in respect to the estate actually created by the will in the first taker, and his intent as to the legal results, and his design in point of fact to apply the rule; and it has been claimed that if, upon a reasonable interpretation of the will, a freehold is vested in the first taker, those appointed to take in succession must take by inheritance, and not by purchase, and the rule applies notwithstanding the testator may not have intended that the first taker should have power over the succession. They have deemed it impracticable to engraft upon a title by inheritance the effects of a purchase, in obedience to the private intentions of the author of the estate. In the celebrated case of *Perrin* v. *Blake* (*supra*), the struggle was between the intent of the testator and the asserted supremacy of the rule, and as to which should be subservient to the other, and although upon the decision of the case in the Court of Exchequer Chamber, it was held by six of the eight judges that the first taker was seized of an estate tail, which gave him the absolute power of selling or disposing of the estate as he pleased, a majority of the judges by whom opinions were given, in the two courts through which the case passed, relied upon and were for giving effect to the intent of the testator. Mr. Justice BLACKSTONE took the distinction in that case between an intent not to give a power of alienation,

and an intent to negative the rule, denying the sufficiency of
the latter. But it is necessarily a question for the court to
determine whether an estate of freehold is vested in the
tenant for life, and that depends upon the interpretation of
the instrument, whether deed or will, by which the estate is
created, involving, among·other things, a consideration of the
intent of the party creating the estate, as manifested by the
instrument. In determining whether a case is within the
rule under consideration, the deed or will must be judged by
the ordinary rules of interpretation. If the word heirs, or
other like word, is not used in a large sense, and to include
succession, but is used in a restrictive sense, and merely to
describe persons who will answer the description at a future
time, as at the death of the tenant for life, the rule has no application,
and the remainder is contingent till the death of the tenant
for life, upon which event the persons designated as heirs or
otherwise in succession take, not by inheritance from the first
taker, but as purchasers. Therefore, what the grantor or
testator means by heirs, or other like phrase, must first be
adjusted without reference to the rule.

The doctrine that the intent of the testator must control in
this class of cases, and when the rule invoked by the defendants
is involved as well as all others, and that the. rule has no
such binding force as to make it paramount to intention
sufficiently appearing, is well understood and recognized by
the courts of this State, and the question in all the cases is as
to the intent of the testator deducible from and made to
appear by his will. Judges have struggled to support limitations
over, by confining the failure of issue to the death of
the first taker, and have done so when they could consistently
with the terms of the will. (*Patterson* v. *Ellis*, 11 Wend.,
260; *Wilson* v. *Wilson*, 32 Barb., 328.) Estates tail were
abolished quite early in the history of the State (1 R. L., 52,
§ 1; 1 R. S., 722, § 3), and the rule in *Shelly's Case* was
abolished in 1830, with a view to give full effect to the intent
of donors and testators in all cases, unembarrassed by the
technical rule referred to. (1 R. S., 724, § 22; rev. notes,

5 Stat. at Large, 302.) While these statutes do not aid in the disposal of the case before us, for the reason that vested rights cannot be affected by subsequent legislation, they do show the policy of the legislature and the restiveness of the courts and the public, under the application of a rigid and technical rule, originating in circumstances and founded upon reasons which long since ceased to exist and have become obsolete, and which, in the great majority of cases, defeated and frustrated the intent of donors and testators.

If the words of the will of Isaac Lytle necessarily imply a devise to the issue of the tenant for life in perpetual succession — that is, that the devise of the remainder was contingent upon an indefinite failure of issue at the time of the death of the first taker — the rule in *Shelly's Case* must prevail, and under the statute abolishing entails, Joseph Lytle took an estate in fee, and the plaintiffs, as his devisees, are entitled to recover. But as the rule relied upon by the plaintiffs not unfrequently defeated the intentions of testators, especially those who used words which had acquired a fixed and determined meaning, in ignorance of the legal sense thus impressed upon them, and without counsel or advice, courts have been prompt to find reasons for applying a different construction, when necessary to give effect to the intention of the testator; and any expression or any language imputing a definite failure of issue, and indicating that the testator intended that the devise over should take effect upon the death of the first taker, is sufficient to repel the implication of an intent to create an estate tail. (*Wilson* v. *Wilson, supra.*) It is not claimed that an estate tail was in terms created; neither is it claimed that the precise words used by the testator, and in the same connection, have been adjudged as creating such an estate by implication. We are not, therefore, embarrassed by precedents directly to the point in controversy, and are left to construe the will with such aid as the adjudged cases and the doctrines to be deduced from them furnish. It is not deemed necessary to review the cases in detail, or the principles upon which they stand, further than has been done by

Judge Parker, in his opinion in the Supreme Court. A brief reference to the terms of the will and the circumstances and relations of the testator is all, and, perhaps, more, than is necessary to supplement that opinion. The testator was advanced in life, and, by his will, intended to and supposed he had disposed of all his estate, and of the entire interest therein, intending to leave nothing undisposed of or depending upon implication. After disposing of his real property, or the greater portion of it, including the lands in controversy, he says: " This is all my own property, I, by the blessing of God, by my own industry, and now divide between my own children, according to my own will and pleasure, and I allow of no measures to be taken to prevent it." After disposing of his personal and some other property, he makes the declaration that, having disposed of his property according to his mind and will, he, revoking all former wills, allowed that to be his last and standing will. There were living of his children three sons and three daughters. Joseph had been married many years, but how many does not appear, and had no children; and we may assume that it was deemed possible, although not probable, that he should have any. The language of the devise to him is peculiar, and was evidently intended to limit his interest to a possessory right for life in the premises devised. It differs essentially and materially in phraseology from other parts of the will, and the difference is not casual, but intentional and for a purpose. The words are: " I allow my son Joseph to possess, by devise of will, the farm," etc., " as fully and freely as if I had made him lawful conveyance by full covenant, during his natural life." The term of the possession thus devised is limited to the natural life of the devisee. The farm was then devised, although in no very apt terms, to David, another son of the testator, in fee, upon the contingency that Joseph should have no " legitimate heirs." This is the only provision made for David, and he is required by another clause in the will to pay the " child called George," who was a grandson of and brought up by and living with the testator, twenty dollars

when he enjoyed the homestead devised. These circumstances, although slight, indicate that the testator supposed and intended that the devisee in remainder should take upon the death of the life-tenant, if no person was then in *esse*, answering the description of "legitimate heir" of Joseph, as in that event only would David share in his estate or the grandson receive the token of the testator's affection and remembrance. The farm which David occupied, at the time of the making of the will, as well as at the death of his father, the testator, was owned by the testator, and devised to a son of David, in fee-simple, when he should be twenty-one years of age. The devise to the three daughters of other lands was in fee-simple. Another farm owned by the testator and occupied by Joseph, was devised to a grandson in fee, charged with the support of Joseph's wife, should she survive her husband, and he also gave to her ten acres of land, with the house and barn, during her lifetime, if she should survive her husband. These provisions also indicate not only an absence of intent to give to Joseph an estate of inheritance, or the power of disposal of the homestead, but clearly evidence a different and contrary design, and to give to him an estate in fee would frustrate the clearly expressed will of the testator. The clause upon which it is sought to raise an estate tail by implication, follows the gift of the possession to Joseph for life, and is in these words: "But if he (Joseph) leaves no legitimate heirs, then in that case the property I allow," etc., devising it to David in fee. Now the words "legitimate heirs," had in the mind of the testator no other meaning than "children born in lawful wedlock," or "children" generally, and did not refer to heirs generally, collateral as well as lineal, or issue in indefinite succession. It was "children of Joseph which he should leave," that is who should be living at his decease, for whom the testator intended to provide. They were the persons indicated and pointed out as devisees. Such is the natural import of the language as it would be understood by non-professional persons of a limited education. It would be contrary to the evident

import of this clause, as the same would be understood by the body of the people, and as the testator would and did understand it, as well as to the general scope and terms of the will, read as a whole, to construe these words as words of limitation, and not as descriptions of persons, and make the devise over take effect only upon an indefinite failure of issue. The term " children " may be regarded as the equivalent of " legitimate heirs," as used by the testator. The term " children " is primarily and technically used as a word of purchase and not of limitation, and the immediate descendants of the person named as the ancestor. In such sense the words must be taken as used in the will, unless a different signification is imposed upon them by the testator by other parts and clauses of the will. (*Prowitt* v. *Rodman*, 37 N. Y., 42; *Mowatt* v. *Carow*, 7 Paige, 328.) The words, " legitimate heir," are not either technically or in common parlance the equivalent of " issue " or " issue of his body," as imputing an indefinite limitation, and the adjudications in which those and like phrases have been involved are not applicable, save as they support the general rule that the intent of the testator, when satisfactorily and by proper methods ascertained, must control in the interpretation of wills, so far as such intent is consistent with the rules of law. Construing and giving effect to the words " leaving no legitimate heir " as a definite limitation, and the last two words, " legitimate heir," as words of purchase, there is no difficulty in giving full effect to the " mind and will " of the testator. The law would imply a devise in fee to the children of Joseph living at the time of his death, and thus give effect to the intent to provide for them in case any should be left by, that is, who should survive Joseph, the first taker, and to limit the estate of Joseph to a life estate, and carry the remainder to David upon the happening of the contingency, which did actually happen, that Joseph died leaving no surviving child. It may be that this construction of the will is subject to criticism, and cases apparently in conflict with it may be found, but the same may be said of any

construction which could be put upon a will inartificially drawn, regardless or in ignorance of technical rules, or of the artificial and technical meaning of terms. We believe the construction given is required by the terms and general scope of the will, and the manifested and express intent of the testator. Neither the plaintiffs or Joseph Lytle, under whom they claim, can take title under the sheriff's deed to Joseph. It was a breach of duty, and a violation of the fiduciary relations existing between him and the heirs and devisees of Isaac Lytle, to purchase the lands for himself. He had abundant means in his hands for the payment of the judgments upon which the lands were sold, and it was a fraud upon the devisees to suffer the same to be sold, and equity will not permit him, or those claiming under him, to reap the benefit of the fraud, but will rather hold him to have taken the title for the benefit of and in trust for the devisees entitled. A trustee, or one charged with the duty of protecting and caring for property as executor, trustee, agent or otherwise, cannot deal with or become the purchaser of it for his own advantage, and to the prejudice of *cestuis que trust,* heirs, devisees or principals. This principle is universal, and applies to all persons having a duty to perform in reference to a sale, inconsistent with the character of purchaser. (*Torrey* v. *Bank of Orleans,* 9 Paige, 649; S. C., 7 Hill, 260; *Bridenbecker* v. *Lowell,* 32 Barb., 9; *Dobson* v. *Racey,* 3 Sandf. Ch., 60; *Moore* v. *Moore,* 1 Seld., 256.) The title taken by Joseph upon the purchase at sheriff's sale, in fraud, in equity inured to the benefit of the devisees entitled under the will of Isaac, and cannot be set up in hostility to those claiming under the will. The taking of a quitclaim deed by David I. Lytle, from the widow of Joseph, does not estop those claiming under him from asserting a title adverse to that of Joseph or the grantee in the deed. (*Sparrow* v. *Kingman,* 1 Comst., 242.)

The order granting new trials should be affirmed, and judgment absolute for defendant, with costs.

All concur except RAPALLO, J., not voting.

Order affirmed, and judgment accordingly.