NEW YORK COUNTY.—HON. D. G. ROLLINS, SURRO-
GATE.—August, 1885.

MATTER OF ROBERT.

*In the matter of the judicial settlement of the account
of* CHRISTOPHER R. ROBERT, *as executor of the
will of* CHRISTOPHER R. ROBERT, *deceased.*

The word, "indebtedness," is not exclusively a term of legal technicality,
and does not always involve the idea even of pecuniary obligation.
Like that of any other word used in a testamentary paper, its signifi-
cation is open to construction; and it may be necessary to scrutinize
the provisions of the testator's will, and even the condition of his
estate, and his relations to the objects of his bounty, in order to ascer-
tain the sense in which he has seen fit to employ it.

The power of incorporating the contents of extraneous papers, by suitable
words of reference in a will, is undoubted, and subject only to the
limitations, that the party asserting such power to have been exercised
must show the papers in question to have been in existence when the
will was executed, and identify them as those to which the testator
referred.

Dyer v. Erving, 2 *Dem.*, 160—adhered to.

Testator died in October, 1878, leaving four children, him surviving, and a
will, whereby he divided his residuary estate into fiftieths, which were
bestowed, in specified proportions, upon those children and an institu-
tion bearing his name.   The instrument also provided that "all mon-
eys or indebtedness which shall appear upon any inventory or ledger
or books of account" kept by him or under his direction, "charged
as due" to him from either of the beneficiaries, during his lifetime,
"and as an outstanding or unsettled account" at the time of his de-
cease, should be deducted from the share or portion of the person
concerned.

It appeared that, for many years before his death, decedent was accustomed
to keep formal books of account, containing a detailed record of his
business transactions, and, during at least thirteen years preceding the
execution of his will, had annually prepared a paper, styled by him an
"inventory," showing the nature and value of his property.   It was
not seriously disputed that, under the circumstances set forth in those
books and papers, a son, F., had received from testator $20,000, and

MATTER OF ROBERT.

that the latter had expended, for the benefit of a daughter, J., $50,000; none of which moneys had ever been restored to the estate.

By numerous entries, *all made before the will was executed,* the testator had included these items in the list of his "assets," although they were generally afterwards deducted, from the "total assets," as "unproductive" or "unavailable property," leaving a balance which was described as "net" or "available assets," etc; while, in the "inventories" of 1871, 1874 and 1875, the same items were finally again added to the available assets, as "amounts due" from F. and J., and included in the "amount for distribution." Upon the day book of 1864, was an entry concerning the $50,000 item expended for J., stating: "I charge the amount to her," etc.; and another to the effect that the $20,000 had been "advanced to F., on account of his portion" of the estate.—

*Held,* upon a view of the whole will, and the books and papers therein referred to, that the contested items represented an "indebtedness" to testator from F. and J., respectively, within the meaning of the will, and that their portions abated accordingly.

Robert v. Corning, 23 *Hun,* 305; s. c., 89 *N. Y.,* 241—explained; Rogers v. Daniell, 8 *Allen,* 343—distinguished.

HEARING of exceptions to report of referee to whom were referred the account, and objections thereto, filed by executor, in proceedings for judicial settlement. The facts appear sufficiently in the opinion.

PLATT & BOWERS, *for executor.*

GRAY & DAVENPORT, *for Frederick R. Robert.*

CHARLES F. STONE, *and* F. N. BANGS, *for Mrs. Corning.*

SHEARMAN & STERLING, *for Robert College.*

THE SURROGATE.—Christopher R. Robert died in October, 1878, leaving him surviving four children, Christopher, Howell, Frederick and Jane.

By the fourth article of his will, executed in January previous, he provides that his residuary estate shall be divided among his children, above named, and an educational institution founded by him,

and known as "Robert College" of Constantinople ; such division to be made in the following proportions : twelve fiftieths to Christopher, twelve fiftieths to Howell, eleven fiftieths to Frederick, ten fiftieths to Robert College, and five fiftieths to Jane.

The sixth article of his will is as follows :

" All moneys or indebtedness which shall appear upon any inventory or ledger or books of account kept by me or under my direction, charged as due to me from any or either of my said children or Robert College of Constantinople, during my lifetime, and as an outstanding or unsettled account at the time of my decease (whether with or without security), shall be considered as forming part of my estate mentioned or referred to in the fourth article of this my will, and a discharge from such indebtedness by my executors shall be deemed and taken as an equivalent of an equal amount paid such college, child or children, on account of its, his, her or their share and portion under this will ; and my executors are hereby directed to deduct the amount of such indebtedness from such respective share or portion ; but no interest is to be charged upon or added to any such indebtedness, except in case a bond, note or other obligation securing such indebtedness, be found among my assets, upon which said bond, note or obligation interest has been paid or charged ; in which case the said indebtedness shall continue to be charged with interest. Any items or charges which may appear in any account of my private, personal or family expenses shall not be included or charged as such indebtedness. Nor shall any moneys which shall appear on my books

charged to either of my said children to a furniture or allowance account be debited to such child on the settlement of my estate, but the same is considered as a gift made by me to such child during my lifetime."

Upon certain inventories, ledgers and books of account kept by the testator or by his direction, appear two items that are the sole cause of the present contention; one, an item of $50,000, associated with the name of Mrs. Corning, the testator's daughter Jane; the other, an item of $20,000, that concerns his son Frederick.

It is claimed by the executor, whose account is now before me for judicial settlement, that these items are "moneys or indebtedness charged as due," etc., within the meaning of article sixth (*supra*); that they should accordingly be reckoned as a part of the distributable assets of this estate, and, upon the division of those assets into fiftieths, should be respectively charged to Mrs. Corning and Frederick Robert, as an equivalent of so much money actually paid to them on account of their interest as residuary legatees.

It is insisted, in opposition, that the sixth article of the will does not cover, and was not meant to cover, either of these disputed items, and that, within the meaning of that article, neither of them represents an "indebtedness" to the testator. The latter contention was sustained by the referee to whom were submitted the issues of this accounting. Shall his report be confirmed?

At the threshold of this inquiry, it is important to consider whether, in whole or in part, the questions involved have already been adjudicated. There has

been tried and determined at Special Term of the Supreme court, before VAN BRUNT, J., an action for the construction of this will. In that action, the validity of the sixth article and, to some extent at least, its true interpretation were subjects of consideration. The meaning ascribed to it by VAN BRUNT, J., was subsequently accepted as correct both by the General Term of the Supreme court and by the Court of Appeals.

It is claimed by some of the counsel in this proceeding that the Supreme court determination has definitively established two propositions:

*A.* That, although the testator's inventories, ledgers or books of account contain entries of amounts "charged as due," etc., such entries will not of themselves warrant the inclusion of such amounts among the distributable assets of the testator's estate, and the application thereof to the shares of the persons against whom they are respectively "charged as due;" but that such inclusion and such application can be justified only by proof that such entries are true entries, descriptive of transactions that have actually taken place.

*B.* That the word "indebtedness" is a technical term, which must ordinarily be interpreted according to its strict legal signification, and that its signification as used in the sixth article of the will is in no respect enlarged, either by the fact of its association with the word "moneys," or by any evidence that the testator has otherwise afforded of his intention to give it a wider scope than is generally accorded to it.

The referee has reported that, in his opinion, the

judgment in the Supreme court action is not decisive of the present contention, and is not pertinent, indeed, to the issues now to be determined. It appears, from the pleadings and papers in that action, that the sixth article of this will was submitted for judicial construction because of doubts respecting its validity. There was thought to be some ground for insisting that the testator had undertaken therein to give full and absolute testamentary efficacy to such inventories, accounts and entries, as, not being in existence at the date of his will, he might thereafter cause to be prepared in his lifetime. It was, of course, conceded on all hands that, if the provision in question involved of necessity this unwarrantable assumption of authority, it was utterly invalid. To sanction such an exercise of testamentary power, would be in effect to permit a testator to revoke or alter at pleasure his formally executed will, in utter disregard of those statutory requirements without which no revocation or alteration can be made effective.

If, on the other hand, such sixth article could be fairly construed as directing that the amount of the legacies given by article four should be subject to reduction, from time to time, after the execution of the will, in case moneys or other property should under certain specified circumstances be advanced by the testator, to or in behalf of the legatees, and in case, also, an entry or record of such advances should be made in the books and papers in such sixth article specified, then that sixth article could be upheld as in all respects valid and effectual.

Now, as I understand their language, the learned

judges, who respectively pronounced opinions at Special and General Term of the Supreme court and in the Court of Appeals, simply meant to declare that this testator did not, by the sixth article of his will, seek to achieve the legal impossibility of reserving to himself the varying of his testamentary dispositions by the mere subsequent creation or alteration of unattested instruments. And I agree with the referee in thinking that, in all that VAN BRUNT, DAVIS, and RAPALLO, JJ., have said respecting the inefficacy of mere book entries to affect the testator's scheme of distribution under his will, they probably had in mind such entries only as were made, or as might have been made, by the testator or by his authorized agents, *after* the will was executed. In point of fact, it was *before* that date that every entry was made with which we are concerned in the present contention. This circumstance was not alleged in the pleadings, and was not disclosed by the evidence in the Supreme court action. Whether, therefore, entries that were made *before the execution of the will,* as to " moneys or indebtedness charged as due " in any " inventory, ledger or books of account " kept by this testator, can be regarded as sufficient of themselves, and without proof of the actual transactions which they profess to record, to authorize the inclusion in the assets of this estate of the sums specified in such entries, and the deduction of those sums respectively from the share or portion of the persons to whom such entries relate, is a question that neither the Supreme court nor the Court of Appeals has distinctly and formally determined.

In Dyer v. Erving (2 *Dem.*, 160), I recently had occasion to consider how far a testator can give to papers not physically connected with his will, a testamentary efficacy.   I adhere to the opinion there expressed, that the power of incorporating the contents of extraneous papers by suitable words of reference in the will itself is undoubted, and that it is subject only to these limitations: The paper sought to be incorporated must be shown to have been actually in existence at the time the will was executed, and to be the selfsame paper which the testator by his words of reference designed to indicate.

Within those restrictions it is possible, I take it, for a testator, at the time of executing his will, to give precisely the same effect to the provisions of an extraneous paper, itself unattested, as he is able to give to the provisions of the will itself.   The language of RUGER, Ch. J., pronouncing the opinion of our Court of Appeals in the Matter of O'Neil (91 *N. Y.*, 516), may, perhaps, indicate a disposition in that court to narrow to some extent the scope of referential words in testamentary papers; but the intimation is *obiter*, and there is nothing in the decision which conflicts with the proposition above stated.   I am clear, therefore, that it was in the power of Mr. Robert, when he executed this will, to make such reference therein to entries *then existing* upon his inventories or books of account, and associated with the name of any of his children, as to constitute the sums specified in those entries a charge against the portion of his estate which he allotted to such child by his will; and to make that reference, too, in such terms that, in any controversy over dis-

tribution, the question whether the entries were true or false, would be utterly immaterial. This view is not at odds with anything that is said either in Robert v. Corning (23 *Hun*, 305; s. c. on appeal, 89 *N. Y.*, 241) or in any other New York case that has fallen under my observation.

I am not, however, in accord with the referee, in the opinion that the Supreme court action has resulted in no determination that must here be regarded as *res adjudicata;* and for this reason—the testator has not contented himself with saying : "All moneys or indebtedness which *now* appear in entries upon any inventory or ledger or books of account, etc., charged as due, etc., shall be considered," etc.

Instead of the word " now," or some equivalent word or phrase calculated to exclude all such entries as were not in existence at the date of the will, he has used the word " shall," which is broad enough to cover not only the entries then existing, but such entries as might be made thereafter. He has not used one form of words to declare his intentions with reference to entries already made, and another form of words to declare his intentions respecting entries that might be made thereafter, but the very same words are set to do duty for both classes of cases. Now, the courts that have determined Robert v. Corning have, as it seems to me, put *upon those words* a distinct and definite interpretation. They have adjudged that the expression, "indebtedness charged as due," in article six, does not simply mean a mere book entry of an item in such entry styled an " indebtedness," but that it has a dual significance, involving the ideas,

(1) of indebtedness (whatever that word may mean as used by this testator) in point of fact, and arising from some actual transaction; and (2) of a written entry relating to such indebtedness, and charging the same as due.

It is true, as has been stated already, that, in thus defining the meaning of the phrase in question, it was entries after the will, and not entries before, that were under judicial consideration. And it is quite possible that if, in the construction suit, it had clearly appeared that, between the making of the will and the death of the testator, no entries had in fact been made such as are contemplated by the sixth article, the court at Special Term might have interpreted that article in accordance with the decision of the Master of the Rolls, in Quihampton v. Going (24 W. R., 917), and might accordingly have held that entries which existed at the date of the will, and which created charges against the testator's children, should be deemed sufficient, of themselves and without proof of their accuracy, to justify a corresponding charge against such child's distributive share.

But, under all the circumstances, I do not feel warranted in holding that, even in its application to entries made before the execution of the will, the phrase " indebtedness charged as due," has any different meaning from that which the Supreme court and the Court of last resort have already ascribed to it. In so far, therefore, as this disputed phrase has, for any purpose, been defined in Robert v. Corning, I feel bound to adopt that definition for the purposes of this accounting.

But I refuse my assent to the contestants' second proposition, heretofore designated as "*B.*" I hold that, for solving the questions here in dispute, the judgment in the suit for the construction of the will has made this contribution, and this only—it has established that the two items of $20,000 and $50,000 are not to be regarded as part of the testator's assets, and are not, in the judicial settlement of the executor's accounts, to be taken as part payments respectively of Frederick's ten fiftieths and Mrs. Corning's five fiftieths, unless they are: (1) as a matter of book entry, and (2) as a matter of fact, items of indebtedness, *within the meaning of that word as used by the testator.*

The contestants do not seriously dispute that Frederick Robert, under the circumstances that are set forth in the inventories, ledgers and books of account, received from the testator the sum of $20,000, which was never repaid in the testator's lifetime, and has never since his death been restored to the estate. Nor is it seriously disputed that, at the time indicated in such inventories, ledgers and books of account, the testator expended $50,000 for the benefit of Mrs. Corning, and that the same never thereafter found its way into the assets of the estate. I find, upon the evidence, that those amounts were in fact respectively applied by the testator to the use of his son Frederick and his daughter Jane, in the manner hereinafter indicated.

The chief contention of the contestants in respect to these two items is, that they are not items of " indebtedness " within the meaning of article six, but

are mere gifts or advances which should not be considered in adjusting the shares of the residuary legatees under the will. It is claimed, too, that, in the suit for construction, there was assigned to this word "indebtedness" a definite and precise meaning, which the Surrogate is here bound to recognize and admit.

Let us first consider the latter proposition.

Said Judge VAN BRUNT, at Special Term (case on appeal, fol. 93): "It would seem from this paragraph" (that is, from article six) "that the testator simply intended to have it understood that any moneys which he advanced to his children, and which he charged in his books of account, were to be treated as advances and not gifts. There is nothing in this clause which precludes the idea that the person against whom the charges were made had not the right to prove that *no indebtedness existed.* In fact, the whole phraseology shows that it was *only existing indebtedness* which was to be deducted, if found charged on the testator's books, and that the charges in the books were not to be arbitrarily deducted; but, as I have said, they must have their foundation in the *indebtedness.*"

DAVIS, P. J., delivering the opinion of the General Term (Robert v. Corning, 23 *Hun*, 305), said: "The sixth provision of the will was, we think, only intended by the testator to determine what kinds of indebtedness of his children and of Robert College should be treated as advances. In substance, it directs that none which does not appear upon the inventory or ledger or books of account kept by him, or under his direction, charged as due to him, shall be consid-

ered as an indebtedness forming part of his estate. Or, in other words, he meant to say that only advances or *actual indebtedness* which had taken the forms prescribed should be treated as advances, to be taken from the share or portion of his several legatees under the will. The *indebtedness* must be *actual.*"

The Court of Appeals, ANDREWS, Ch. J., delivering its opinion, said (Robert v. Corning, 89 *N. Y.*, 241): "We think the sixth section of the will is valid within the rule that a testator may direct that the amount of a legacy, once completely fixed by the will itself, shall be diminished *by events actually occurring as matters of fact*, but not by an unattested testamentary writing, disconnected from any actual occurrence. The sixth section was, we think, intended to provide simply, that any *actual indebtedness*, found charged concurrently therewith on the testator's books of account, should go in diminution of the payments to the several legatees as a part of their shares respectively." Now, I do not understand that, by thus coupling the word "actual" with the word "indebtedness," these learned Judges designed to define, or in any manner to describe or illustrate the meaning which should be accorded to the latter term in Mr. Robert's will. It is argued that, by their frequent use of the expression "actual indebtedness," they intended to indicate such an obligation of the legatee to the testator as would constitute an indebtedness in the strict legal sense of that word, and that I must, accordingly, thrust aside, as irrelevant and immaterial, any evidence that might be gleaned from the

will itself, or from the inventories, ledgers and books of account to which the will refers, as to the sense in which that word "indebtedness" is employed by the testator. I see no just ground for the maintenance of such a position. There was not the slightest occasion for defining the word "indebtedness" in passing upon the validity of article six, and neither the Supreme court nor the Court of Appeals was in possession, or could have supposed itself to be in possession of certain facts and circumstances absolutely essential for arriving at a just and proper interpretation of that expression. The actual pecuniary relations between the testator and the legatees, whose interests are involved in this accounting, were not disclosed by the pleadings or evidence in that action; the ledgers, books of account and inventories mentioned in the will, made by appropriate words of reference a part of that instrument, and as necessary, therefore, for its true interpretation as any one of its own clauses, were not before the Supreme court or the Court of Appeals. The word "indebtedness" is not exclusively a term of legal technicality. It has at times a signification far broader than the law dictionaries assign to it, not even involving of necessity the idea of money obligation. Like any other word, therefore, which is used in a testamentary paper, its signification is open to construction, and it may be necessary to scrutinize the provisions of the testator's will, and even, under some circumstances, the condition of his estate and his relations to the objects of his bounty, in order to ascertain the sense in which he has seen fit to employ it. For it is the duty of the court in

all cases to interpret a testator's words according to the meaning which he himself has chosen to assign to them.

Said CHURCH, Ch. J., pronouncing the opinion of the Court of Appeals in Hoppock v. Tucker (59 *N. Y.,* 209): " The substance and intent, rather than words, are to control. The intention of the testator is the first and great object of inquiry, and to this object technical rules to a certain extent are made subservient. . . . . The language used " (referring to the particular language then under consideration) " is in a certain sense equivocal. Standing alone, the law would give it a certain meaning, but it would do so only in obedience to a supposed intent. If by the light reflected from other provisions a different intent is discoverable, the reason of the rule fails and a different result is reached."

Said ALLEN, J., speaking for the same court, in Lytle v. Beveridge (58 *N. Y.,* 598): " The intent is to be gathered from the will. . . . . . Words which have acquired a fixed legal meaning must be intended to have been used in the sense which has been impressed upon them, *unless it is apparent that they were used by the testator in a different sense.* . . . . . The doctrine that the intent of the testator is the guiding and controlling rule of interpretation requires not unfrequently a disregard of the usual technical meaning of words and phrases, and, when necessary, such technical meaning must yield to the evident intent of the testator. . . . . . There is no rigid rule of law to the effect that words shall only be used in one certain sense, or requiring courts to give language

the same interpretation and effect under all circumstances and in every connection. The infinite variety of circumstances that may occur, distinguishing one case from another in the use of the same words and phrases, renders it impossible to give an absolute and unbending rule for the interpretation of language applicable to all cases."

In the recent case of Phillips v. Davies (92 *N. Y.*, 199)—a suit for the construction of a will—FINCH, J., commenting upon an interpretation suggested by one of the counsel, said: "If such was the real meaning and intention of the testatrix, if an examination of the whole will forces that conviction, if its plain and definite purposes are endangered by inapt or inaccurate modes of expression, and we are sure that we know what the testatrix meant, we have a right and it is our duty to subordinate the language to the intention. In such a case the court may reject the words and limitations, supply them or transpose them to get at the correct meaning."

Whether in the will now under consideration, and by the extraneous documents and papers which it incorporates into its own body, this testator undertook to assign for himself a meaning to the word "indebtedness," no other court than this has ever, so far as I know, had either the means or occasion to determine. All that other courts have adjudged is this: Whatever may be the meaning of the word "indebtedness" as used in the will of Christopher R. Robert, a mere entry in his books and papers of a sum charged as due to any of his children, or to Robert College, shall not of itself be taken as sufficient evidence of an

" indebtedness " to set in motion the sixth article of
the will, for the diminishing of the distributive shares
of such children or of such college ; but, before that
clause can become operative, such entry must be sup-
plemented by some proof that the transaction or oc-
currence recorded by such entry, and claimed to con-
stitute or create the indebtedness, actually took place.

If my meaning is not entirely clear, I may make
it so by an illustration. If upon all the evidence
there appeared to be no foundation in fact for the
various entries in the testator's books and inventories,
purporting to show the expenditure by him of $50,000
for the house which he gave Mrs. Corning, then the
mere existence of the entries which charge the sum
of $50,000 as due from Mrs. Corning to the testator
would not justify the inclusion of that amount among
the assets of the estate, or its charge to Mrs. Corning
as a part of her distributive share.    But there is noth-
ing in the decisions relied on by the contestants which
seems to me to require that, as a necessary prelimi-
nary to charging Mrs. Corning with said $50,000, it
must be shown that the expenditure of that sum for
her benefit was not a mere gift or advance, but was a
transaction that made her in strict legal sense her
father's debtor.    If he chose for his testamentary
purposes to regard that transaction as creating an
indebtedness, and if he indicated his purpose in that
regard by charging that amount as such, then a case
has arisen in which, for aught that has been decided
to the contrary, that sum may be held justly deducti-
ble from Mrs. Corning's share in this estate.    I feel
free, therefore, to decide, unhampered by anything

that has been determined in Robert v. Corning, the question whether this testator has or has not stamped upon the word "indebtedness" a special and peculiar import.

At this stage of the discussion, I may conveniently refer to the case of Rogers v. Daniell (8 *Allen*, 343), which is cited by the contestants as lending efficient support to their claim, that in testamentary papers the term "indebtedness" should receive its strict technical interpretation. The testator, whose will was there under review, had bequeathed a sum of money in trust for his children, and had directed that any "legal debt due" from them respectively at his decease should be deducted from their several shares. He had at various times lent money to married daughters, and when he died he held promissory notes that they had given him in token of their obligations. It was held that, under the law of Massachusetts, these notes were without validity because of the coverture of their makers.

In answer to the contention that, for the purposes of the will, they should nevertheless be regarded as "legal debts," the court said: "The whole question seems to be whether, by a latitudinarian construction of the phrase, 'legal debt,' the court cannot say that these notes are embraced within its terms. In support of this view, the argument is pressed upon us that the surrounding circumstances all tend to show that such must have been the intention of the testator; that no other legal debts of his children are known to exist to which these words could refer. It is said that the intention of the testator is to govern.

That is true; but such intention is to be found in the words of the will, where the same is clearly stated. The phrase, legal debt, must certainly mean a debt which can be enforced in a court of law. These promissory notes signed by the plaintiff could not be enforced in a court of law against her, nor are they contracts for which she would be liable in a court of equity. It would have been very easy for the testator to refer to those notes and direct that they should be deducted from the portion given to the plaintiff. But as he has not done so, and has used language which does not include them as subjects of deduction, we must give to the words of the will their plain and natural meaning."

Between the facts of the case just cited, and the facts with which we are here dealing, there are obvious and important distinctions. One of them is this, that the word "debt" is in Rogers v. Daniell, but not in the case at bar, expressly taken out of the region of doubtful interpretation by the restrictive word "legal"; and this is also to be specially noted, that in the Massachusetts case the testator gave no intimation in his will, either by reference to extraneous papers or otherwise, that he had used the phrase "legal debt" in any other than its customary technical meaning. Here, on the other hand, there is, in the testator's will, such mention of books and papers as to make them a constituent part of that instrument, and to necessitate, therefore, a reference to their contents for ascertaining the full measure of his testamentary purposes.

Let us now proceed to examine in the journals, ledgers and inventories of Mr. Robert, the various entries made by him or under his direction touching the aforesaid items of $50,000 and $20,000.

The evidence shows that, for many years prior to his death, he was accustomed to keep formal books of account, upon which was spread, with very great particularity, the record of the business transactions of his life. It shows also that, for at least thirteen years before the execution of his will in 1878, he annually prepared a paper, styled by him an " inventory," which contained a detailed statement of the nature and value of his possessions. The inventory for the year 1877, which is the last of the series, includes under the heading of " ledger accounts " these two items, among others : " Frederick Robert, $20,000 ; Jane R. Corning, $50,000." These items form a part of an aggregate sum designated as " total assets," from which is subsequently deducted the gross amount of " liabilities," leaving a remainder designated as "net assets." From this last named balance is then deducted the sum total of certain items of so-called " unavailable property." Among those items are the two of $50,000 and $20,000, above specified. Both these items appear also on the testator's ledger. Frederick Robert is debited under date of January 1st, 1876, with $20,000. This purports to be a balance of several items of debit and credit, whereof the first is dated February 22nd, 1864, and is a debit of precisely $20,000. In the testator's day book, under the last named date, is the entry following :

" Advanced to Frederick Robert on account of his portion of my estate, in order to enable him to go into business, which is to be charged him on settlement of my estate, but no interest, $20,000."

These entries in the day book and ledger are associated with each other by cross references to the respective pages whereon they appear.

In the same day book, under date of May 5th, 1864, appears the entry following :

"Having, on the 19th day of May last, by agreement of that date, bought of John H. Sherwood, two houses and lots, Nos. 8 and 10 East Fortieth street, and two stables and lots, Nos. 7 and 9 East Thirty-ninth street, at the price of $140,000, intending the house No. 10 East Fortieth street and the stable No. 9 East Thirty-ninth street for my own occupancy, I have this day paid him on account thereof $50,000. The house and lot No. 8 East Fortieth street I have bought for my daughter Jane R. Corning, and I propose eventually to give her the stable and lot No. 7 East Thirty-ninth street, but for the present I take title in my own name."

On the same page of the day book, and under date of May 6th, 1864, is the entry following :

" Paid John H. Sherwood for the house and lot No. 8 East Fortieth street, which I have given to my daughter, Mrs. Jane R. Corning, by deed from the said Sherwood, as her separate property and as a part of her share in my estate, $50,000. *I charge the amount to her*, but though counted as a part of my assets, no interest is to be charged thereon."

In the ledger of corresponding date, is this item in the account of Mrs. Jane R. Corning: "1864, May 6, to cash, $50,000."

There are cross references between the day book entries and the entry in the ledger. These are the same amounts which were carried along from year to year in the books of the testator, and are referred to in every one of his annual inventories. Those inventories, with but a single exception, bear the signature of the testator. As regards both the character and arrangement of their contents, they are all substantially alike; but there appear in some of them certain features of special significance as regards the present inquiry. In all of them the items here in question are reckoned by the testator as constituting part of the "assets" of his estate. In some of them these items are deducted from the so-called "total assets" as "unproductive," and the balance after that deduction is sometimes styled "net assets," and sometimes "available assets" or "available property." The inventories of 1871, 1874 and 1875 have certain noteworthy features which distinguish them from all the rest. The two items here in dispute appear in customary fashion under the title of "ledger accounts," and, as usual, swell the amount of the "total assets." They are then, with other considerable items, deducted as "unavailable"; but the sum remaining, which is called "available assets," is in each instance subsequently increased by the addition of these very items of $50,000 and $20,000. I quote from the inventory of 1871:

MATTER OF ROBERT.

| | | |
|---|---|---|
| Available assets............ | $582,568 33 | |
| Less separate property of | | |
| Mrs. Robert............ | 70,000 00 | |
| | | $512,568 33 |
| Add amount due ·from J. | | |
| R. Corning............. | 49,379 28 | |
| (This is practically the | | |
| $50,000.) | | |
| Frederick Robert.......... | 20,000 00 | |
| Howell W. Robert........ | 8,000 00 | |
| | | 77,379 28 |

| | |
|---|---|
| Amount for distribution, exclusive of Brookhaven property, lands on Missionary Ridge and Lookout Mountain, real and personal estate............. | $589,947 61 |

In the inventories of 1872 and 1873, there is no similar reference to the items " charged" to Frederick and Mrs. Corning as " due," and there is no inclusion of· the amount covered by those items as a portion of testator's estate for the purposes of distribution; but the items reappear in the inventory of 1874. To the " available assets" of that year are added " Amount due from F. Robert, $20,000; amount due from J. R. Corning, $50,000."

These sums are included in the grand total, which is declared by the testator to be "the amount for distribution as near as I can tell." They appear also in the inventory of 1875, as the. " amounts due " from Frederick Robert and Mrs. Corning respectively, and form a part of the " amount for distribution as near as I can now judge."

It is upon this state of facts that the question arises, whether, within the meaning of the testator's

will, the advances of $20,000 and $50,000 must be regarded as " moneys or indebtedness," which, during the testator's lifetime, were " charged as due" from his children, Frederick and Jane, and which continued to be " outstanding or unsettled accounts" at the time of his decease.

It can scarcely be disputed that if, upon the face of his will, the testator had said : " By my use of the word *indebtedness* in this instrument I design to include all moneys heretofore paid to or for any of my children by way of loan, or by way of gift, or otherwise, in case such moneys shall be found charged as due against the respective names of my said children in my books of account," etc., it would be my duty to interpret that will in the light of his own definition of " indebtedness." Has not the testator substantially said that very thing in the will before me ? Unless other considerations, which will presently be discussed, shall warrant a different conclusion, I shall feel bound to hold that the items here in dispute, are " items of indebtedness charged as due" within the meaning of that term in the will, and that they formed part of " outstanding and unsettled accounts" at the testator's death.

Such a conclusion would find no little support in a fact proved before the Surrogate after the submission of the referee's findings. About two years prior to the execution of his last will, this decedent executed a testamentary paper containing provisions very similar to those which appear in the later instrument, both as regards the fractional partitionment of interest among the residuary legatees under article four,

and as regards also the provisions for adjusting charges of indebtedness under article six. That will seems to have been prepared by the testator himself, and it is fair to presume that the inventory of 1875 was then fresh in his recollection—an inventory in which he had included the items of $50,000 and $20,000 as a part of his assets for distribution, and in which he expressly characterized them as amounts due from his daughter Jane and his son Frederick.

Now, is there anything in the language of such provisions of the will as have not yet been considered, or in the results which flow from putting upon the sixth article of the will the interpretation to which I have thus far given countenance, that should lead me to reject that interpretation and adopt the conclusions of the referee ?

It is manifest, upon reviewing the proceedings before that officer, that he was greatly impressed by the claim of the objectors, that, if the scheme of distribution favored by the executor should be adopted, it would produce glaring inequalities in the distribution of the estate. Whether it would or would not accomplish that result is by no means apparent. The inaccuracy of the aphorism, that figures won't lie, finds conspicuous illustration in the ingenious tabular statements that counsel have submitted for my guidance.

By one of these schemes of computation it seems to be established that, if the referee's report shall be sustained, if the $50,000 and $20,000 shall be left out of account by the executors in their administration of article six, and if the children and Robert College shall be paid in full the fractional portions

respectively bequeathed to them by article four, they will all be put on a substantial equality. It is shown by this process that the total share of Christopher will thus amount to $113,000, that of Frederick to $112,000, that of Mrs. Corning to $112,000, that of Howell to $109,000, and that of Robert College to $100,000.

According to the computation of counsel for Robert College, the practical result of the mode of distribution sanctioned by the referee would, on the other hand, be as follows: The sums yet to be paid, plus advances, and the interest and profits that have accrued therefrom, would, in the case of Christopher, amount to $103,000, in that of Howell to $111,000, in that of Frederick to $112,000, in that of Robert College to $84,000, and in that of Mrs. Corning to $183,000.

Each of these modes of reckoning is plausible enough, and each is vigorously supported by considerations that I shall not stop to discuss.

The sole argumentative force of that which is urged upon my attention in behalf of Mrs. Corning and Frederick Robert is dependent upon the theory that the elaborate accounts kept by the testator of his financial dealings with his children and with Robert College, and the testamentary direction for the division of his estate into fiftieths, and for payment of the specified fractional portions to those legatees, evince an intention on his part to effect equality of distribution.

It is by no means clear to me that this was the testator's purpose, and it is by no means clear

that, if it was his purpose, he might not have verily supposed he was effecting it by charging to Mrs. Corning and to Frederick Robert the advances that have occasioned this controversy.   He may, for example, have taken into consideration, in assigning to Mrs. Corning a fractional interest so much smaller than that of the other legatees of his residuary estate, the large sums which, in the progress of years, had been realized by the investment of the $50,000 for her benefit.   And even the fact that, at the date of the will, the condition of his estate was such that a gift of five fiftieths, when reduced by a deduction of amounts " charged as due," would practically be no gift at all, might not have deterred him from assigning to Mrs. Corning that illusory and unsubstantial interest in his posthumous estate.   If it seemed to him that the scheme of division into fiftieths would on the whole work out the result that he sought to accomplish, I think it was quite in accordance with his phenomenally methodical character as disclosed by the evidence, and with that confidence in his unerring wisdom that he so naïvely displays in his so-called autobiography, to accept and adopt it, however unjust or illogical it might appear to other minds.

I have discussed at such length the questions that seem to me of paramount importance in this disputed accounting, that I shall make no allusion to the less important phases of the contention, except to say that I have given them careful consideration, and am convinced that the exceptions to the referee's report must be sustained, and the account of the executor passed as presented.

Let a decree be entered accordingly.