In the Matter of the Estate of J. ALBERT MAHLSTEDT, Deceased.

Surrogate's Court, Westchester County, May 13, 1931.

*Seacord, Ritchie & Young* [*Albert Ritchie* of counsel], for the executors.

*Ackerman & Levet* [*Richard H. Levet* of counsel], for Helen Robinson McGrath.

*Wallin, Beckwith & Edie* [*William J. Wallin* of counsel], for John F. Mahlstedt and Robert A. Mahlstedt.

*Dunlap, Otto & McGovern*, for Gladys S. Mahlstedt.

*McNamara & Seymour* [*Thomas E. Dewey* of counsel], for The J. A. Mahlstedt Lumber and Coal Company.

*Albertson & Meehan*, for Frank A. Garside and Phyllis Garside, stepchildren.

SLATER, S. This is a proceeding to construe the will of J. Albert Mahlstedt, deceased. He was the president and the most active member of the J. A. Mahlstedt Lumber and Coal Company of New Rochelle, which was incorporated in August, 1895. The company was founded by his father. After the elder's death it was conducted by his sons as a business, in which the decedent and his three brothers and half-sister were principal owners of the stock. On December 29, 1919, the decedent published his will in the following words: " After the payment of my just debts, funeral and testamentary expenses, I give, devise and bequeath all of my property and estate, of whatever nature and wheresoever situated,

to my wife Minna Marie Mahlstedt, absolutely, and I nominate and appoint my wife Minna Marie Mahlstedt and my friend Frederick H. Seacord, of New Rochelle, New York, to be the Executrix and Executor under this Will."

The court took extrinsic evidence consisting of an agreement made May 19, 1923, between the company and the decedent, his three brothers and half-sister, co-owners and principal stockholders of the J. A. Mahlstedt Lumber and Coal Company.

In this agreement the four brothers and the half-sister were called the " individuals." The agreement recited that the business, since the father's death, had been conducted by the " individuals " and that " whereas the five individuals above named are now the chief stockholders of said corporation, each owning approximately one-fifth of the capital stock thereof, and whereas the corporation has prospered, conducted as it has been, and it is deemed advisable to insure the continuation thereof, and to prevent the stock of the corporation going into the hands of outside and perhaps unfriendly interests," the parties agreed not to sell their stock without first offering it to the corporation, and, under the agreement, in case of death the legal representatives of any of the individuals could require the corporation to buy his or her stock out of surplus at a price determined as provided in the agreement.

On the 10th day of July, 1925, the testator executed a codicil which is as follows: " This is to be a codicil to my last will. I wish to change only one item and that is The J. A. Mahlstedt Lbr. & C Co stock. In case of my death I want this stock held in trust for my wife & children until my wife's death, then to revert back to the Mahlstedt Lbr. & Coal Co treasury if the Mahlstedt Bros still control it. The income on this stock is to be paid to my wife each year and shall not be less than 5%, as I wish my wife to have income of at least $10,000. per year from this source. This codicil is principally made so that the agreement among the brothers & sister Helen regarding our stock at death shall not be made a burden on the company. That is they will not be forced to pay for the stock but I'm doing this knowing they will take good care of my wife & children and if they need anything will give it to them. " My life work has been the success of the J A M L & C Co & I want them in a safe position.'

This codicil is entirely holographic and written on both sides of one sheet of paper.

At the time of the execution of the protective agreement the stock consisted of 10,000 shares, $100 par, and the four Mahlstedt brothers owned 7,008 shares of the stock of the company. At the time of the execution of the codicil, 6,006 shares were held by the Mahlstedt

brothers. The decedent at this time held 2,009 shares. Trustees held for Robert A. Mahlstedt and the half-sister Helen each 1,196 shares, or a total of 2,392 shares.

The testator died on the 31st day of March, 1927, and the will and codicil were admitted to probate on the 21st day of April, 1927.

At the time of the death of the decedent, two of the three surviving brothers held 2,890 shares, and trustees for a brother and half-sister held 2,392 shares. The stock at this time consisted of 10,000 shares, of which the company owned 2,084 shares of its own stock, leaving 7,916 shares to be voted, one-half of the outstanding stock being 3,958, so that the Mahlstedt brothers individually could have voted 2,890 shares, being less than required for stock control. On the question of control this eliminates the 2,392 shares of the stock held by trustees under the will of Margaret L. Robinson for Robert A. Mahlstedt and Helen Mahlstedt McGrath.

In May, 1927, the directors of the company authorized the issuance of $1,475,000 ten-year gold debenture bonds under debenture agreement. Approximately an amount of $1,000,000 in these bonds is still outstanding. The company pledged its entire assets, and agreed not to suffer to be created any indebtedness, with certain exceptions, nor to pay any dividends except out of subsequent earnings; *nor should it retire any of its capital stock.*

The net estate left by the testator, according to the report of the transfer tax appraiser, consisted almost entirely of his interest in the shares of stock of the lumber company.

On December 16, 1927, a brother, G. Henry Mahlstedt, died leaving a will wherein he left all his property to his wife, Gladys S. Mahlstedt.

The term " will " shall include all codicils as well as wills. (Decedent Estate Law, § 2.) The codicil became a part of the will by operation of law, and the two must be construed together as one instrument. (*Howland* v. *Union Theological Seminary*, 5 N. Y. 193, 214.) A codicil may add to or supplement, or it may alter, qualify, modify or revoke provisions of the will. (*Matter of Buechner*, 226 N. Y. 440; *Matter of Phelps*, 133 Misc. 450.)

An important question presented at the outset relates to the intent of the decedent, which must be ascertained from a reading of the entire document and must be fairly discernible from the words used. (*Matter of Silsby*, 229 N. Y. 396.)

If the will is holographic and drawn by a layman unskilled in legal phraseology, the technical construction of a limitation is subordinate to the intent of the testator as collected from the will itself. (*Matter of Griffin*, 75 Misc. 441, 443.) We seek the intention

of the testator as exhibited by the words as selected. (*Matter of Bump*, 234 N. Y. 60, 63.)

" The unskillfulness of the draftsman should make us more astute in our search to comprehend the intention of the testator." (*Lytle* v. *Beveridge*, 58 N. Y. 592; *Matter of Allen*, 111 Misc. 93; affd., 202 App. Div. 810; affd., 236 N. Y. 503.)

It is never the purpose of the law to defeat the lawful intention of wills. The courts are not concerned with the wisdom of wills, and it is their purpose to carry out the intention of those creating such instruments and to give effect to such intent, so far as it is lawful.

The original will contains a gift of all property to the wife. It is an absolute devise and bequest. Was the gift to the wife cut down in relation to the stock of the lumber company by the words of intent of the codicil? An absolute devise or bequest in a will should not be limited or cut down by subsequent provisions, unless the language is as clear as that granting the devise or bequest. (*Banzer* v. *Banzer*, 156 N. Y. 429, 435.) I hold that the real intent of the testator was to cut down the absolute gift of the stock to the wife. This intent is evident from a reading of the entire document.

The testator in the use of words, in that part of the codicil which is disposing, led to the conclusion that he intended to change the absolute gift to the widow, as provided by the original will, to a lesser estate. (*Matter of Buckley*, 135 Misc. 156.)

Is the codicil precatory and without force? There is a clear and definite intention declared by the testator amounting to a direction or command. The words " I wish " serve to raise the question, but not necessarily to decide it. Considerable time elasped between the making of the will and the codicil. The codicil was a separate instrument in the testator's own handwriting. The cases which hold as precatory such words as " wish," " will," " request," " desire," are those that relate to the use of these words either in or immediately following the clause creating the absolute gift. The facts of the instant case are different. I hold that the 1st paragraph of the codicil is mandatory, equivalent to command. (*Phillips* v. *Phillips*, 112 N. Y. 197; *Washbon* v. *Cope*, 144 id. 287; *Clay* v. *Wood*, 153 id. 134, 142; *Collister* v. *Fassitt*, 163 id. 281; *Erwin* v. *Waterbury*, 186 App. Div. 569; affd., 231 N. Y. 592; *Matter of Davidge*, 200 App. Div. 437; *Matter of Van Deusen*, 111 Misc. 74; *Matter of Golicki*, 116 id. 100; *Matter of Daintrey*, 125 id. 369; *Matter of Blanch*, 126 id. 421.)

The 2d and 3d paragraphs of the codicil are entirely explanatory and precatory.

The words in the codicil are not ambiguous nor of a doubtful meaning. The instant case does not fall within the rule of law laid down in *Roseboom* v. *Roseboom* (81 N. Y. 356); *Clarke* v. *Leupp* (88 id. 228); *Campbell* v. *Beaumont* (91 id. 464); *Post* v. *Moore* (181 id. 15).

" Let the codicil be subjected to the test of probable intention to be gathered from its scheme and framework."

What was the intention of the testator as disclosed by the words of the codicil which relate to his largest asset, the stock of the Mahlstedt Company? The company had never paid dividends. While prosperous and making money, the company was treated by all the brothers as a partnership or a family business. Each received a large salary and made large withdrawals from time to time, such as brothers sometimes do in a family concern. The testator was the guiding hand. Corporate law did not hinder. He was the boss. That was what the testator meant when he said in the last part of the holographic codicil: " My life work has been the success of the J A M L & C Co & I want them in a safe position." The testator had lived well from the salary and advancements taken, as had the brothers. He must have realized that, on his dying, no legal dividends would probably be voted, and his wife would be without income. So this holograph codicil was written. It may be said he had two purposes in mind: *First,* to secure for his wife $10,000 per annum, that is, about five per cent on the stock at par which he held in the company. He had no children born to him and his wife. His next " principal " interest was the company and its success, and the welfare of his brothers. To prevent the company from having to pay for the stock, pursuant to the agreement, if called upon to do so, he gave the stock to the company " if the Mahlstedt Bros still control it." He had faith that the brothers would take care of his wife and her children by a former husband, and " if they need anything will give it to them." This is the intention of the testator painted by his own words.

The testator may have had in mind, too, the death of his wife prior to his own death, in the event of which happening the remainder would be accelerated, if Mahlstedt Brothers were in control, the company taking the gift free from the charge.

Was a trust created? The codicil says: " I want this stock held in trust for my wife and children until my wife's death." It cannot be said that this creates a valid express trust. (*Brown* v. *Spohr*, 180 N. Y. 201, 209.) There is no express gift to the executors and no direction for them to receive or apply the income. A layman's use of the word " trust " is subject to no enlargement because he is such. Technical construction follows as of course. (*Matter of*

*Catlin*, 97 Misc. 223, 228; affd., 179 App. Div. 926.) The testator's attempt to create a legal trust was abortive. The projected trust is clearly a dry or passive trust involving no active duties on the part of trustees. There is a legal estate in the wife of the same duration as the beneficial interest. (Real Prop. Law, §§ 92, 93, 96; *Denison* v. *Denison*, 185 N. Y. 438, 443; *Jacoby* v. *Jacoby*, 188 id. 124; *Monypeny* v. *Monypeny*, 202 id. 90; *Hodgman* v. *Cobb*, 202 App. Div. 259, 265; *Reynolds* v. *Reynolds*, 224 N. Y. 429, 432; *Matter of Bleckwehl*, 80 Misc. 468; *Matter of Bogan*, 129 id. 119; *Matter of Moss*, 137 id. 449.)

The effect of this part of the codicil is to create in the wife a legal estate for life, and not a trust, for the benefit of the wife and her two children. A life estate " can as well be created in money or a fund as it can in real estate." (*Snedeker* v. *Congdon*, 41 App. Div. 433, 436.)

The testator intended to give the remainder to the Mahlstedt Company. He said, " then to *revert* back to the Mahlstedt Lbr. & Coal Co treasury if the Mahlstedt Bros *still control it*." When the testator used the word " revert," he employed it undoubtedly in the sense of " pass to " or " go to." This is precisely the sense in which most laymen unacquainted with the technical rules of the law would use the word " revert." (*Goerlitz* v. *Malawista*, 56 Hun, 120; affd., 130 N. Y. 688; *Hadley* v. *Henderson*, 214 Mich. 157.) This corporation may acquire shares of its own stock by bequest. (Wormser Disregard of Corporate Fiction and Allied Corporate Powers, pp. 125–131; Gen. Corp. Law, § 14, subd. 3, as renum. and amd. by Laws of 1929, chap. 650; Cook Corp. [8th ed.] § 311, p. 1038.)

The remainder, by the terms of the codicil, passed to the corporation without limitation over, subject to two conditions, *i. e.*, that the Mahlstedt brothers *still control it*, and the requirement of the payment of $10,000 to the wife each year. A testator may limit gifts on condition, provided they are lawful. Such condition to a bequest may be either precedent to the vesting of the gift, or may operate as a condition subsequent to divest a bequest already vested; in other words, either the performance of them is made to precede the vesting of an estate, or the non-performance to determine an estate antecedently vested. (2 Jarm. Wills, 842.) Subsequent words are not necessarily conclusive in determining whether the gift is upon condition precedent or subsequent. (*Matter of Baechler*, 121 Misc. 691.) No precise form of words is necessary in order to create conditions in wills. Any expression disclosing the intention will have that effect. (*Booth* v. *Baptist Church*, 126 N. Y. 215.) No technical words indicate the difference between conditions

precedent and subsequent, and the question is always one of intention to be gathered from the whole instrument. The test is whether the language of the particular clause depends on an act to be performed before the estate passes to the company. It must be performed before the estate can vest, or, on the contrary, the act does not necessarily precede the vesting of the estate. (*Finlay* v. *King's Lessee*, 3 Pet. 346, 375; *Matter of Baechler*, 121 Misc. 691, 699, and cases cited; *Matter of Scott*, 204 N. Y. Supp. 478, 491; *Bullard* v. *Village of Albion*, 128 Misc. 292, 297.)

A condition in a gift, performance of which was the motive of the devise, is rigorously enforced.

In the civil law there was no distinction between a condition precedent or subsequent. All conditions had to be performed before the legacy vested. By the common law this rule has become so far modified that, when a condition is precedent, the legatee takes no vested interest until it be performed. When subsequent, the legacy vests subject to be divested on a failure of performance.

" Now it is a general rule of law that a breach of lawful condition annexed to a legacy, either divests it, or prevents an estate therein arising in the legatee, depending on whether the condition is precedent or subsequent." If the condition be precedent, it must be strictly complied with in order to entitle the party to the benefit of the devise or gift. (*Hogan* v. *Curtin*, 88 N. Y. 162, 171.)

Where a condition is precedent, the devise cannot take effect until performance, or *acceptance*, of the condition, and, in case of refusal, lapses. It was the intention of the testator to make no gift to the corporation unless upon the fulfillment of the two conditions *precedent:* (1) Were the Mahlstedt brothers *still* in control? The word " still " means the same as " then." The words " still control " must have the same construction as the words " then control." The testator defines a point of time, his death, when the reasons for the gift must come into play, " still control " of stock ownership, with (2) the added condition of willingness to pay $10,000 per annum to the wife.

The Mahlstedt brothers individually were not still in control at the time of decedent's death, unless stock held in trust for the brother Robert A. Mahlstedt and the half-sister can be counted in favor of the stock control. The protective agreement will throw much light on the testator's intention as to control. This legal question need not be answered, as I will proceed to indicate. The question to be answered first is, did the remainder vest in the company?

I think the question of acceptance is more vital. Did the company ever accept the gift?

Has the company performed any acts which forfeit its right to the legacy? For, if the company fails to perform what is reasonably demanded, such conduct would necessarily forfeit its right to the legacy. (*Livingston* v. *Gordon*, 84 N. Y. 136, 141, 142.) There is a conflict of opinion as to the character, extent and effect of presumption of acceptance in cases where, as a matter of fact, the beneficiary has refused acceptance. This principle of law is considered in *Albany Hospital* v. *Albany Guardian Society* (214 N. Y. 435, 440). The opinion refers to English cases upon the question. In *Welch* v. *Sackett* (12 Wis. 243, 261, 263) the court says: " It seems to me very plain, that it [the title] does not pass in fact until the grantee has actually consented to receive it; and, as of course, that it remains with the grantor, who is unable, without such consent, to vest it in the grantee, * * *. It is far more compatible with common law and common sense, to say that its operation is suspended until the happening of the event indispensable in the law to its validity, namely, an acceptance by the grantee, than to make the law perform the wonderful exploits of vesting and recalling the title contrary to its best settled and soundest principles."

In *Burritt* v. *Silliman* (13 N. Y. 93, 96) the court said: " It seems clear that the law does not compel a man to accept an estate, * * *. But when it turns out that the estate has not been accepted, it remains in the original owner, precisely as if the conveyance had not been executed. It has failed to be effectual to convey the estate, and is, by the disagreement of the party, rendered null." (*Dunning* v. *Ocean National Bank*, 6 Lans. 296, 298.)

A bequest or devise vests in the donee only upon his acceptance thereof, and, especially when onerous, the beneficiary under the will has the right to elect whether to take or not. (40 Cyc. 1892.)

Until a legacy is reduced to possession, it is merely a naked right in an estate to be administered. (*Matter of Wolfe*, 89 App. Div. 349, 351; affd., 179 N. Y. 599.)

An heir at law is the only person who, by the common law, becomes the owner of land without his own agency or *assent*. (3 Washb. Real Prop. [6th ed.] § 1829.)

The question of presumption of acceptance was considered in *Defreese* v. *Lake* (109 Mich. 415, 421) where the court said: " If it be admitted that the law will presume an acceptance, it is not a conclusive presumption, and, when it is shown to have been renounced, it is shown that the title did not vest, and apparently there would be no occasion for divesting a title that had not vested." (*Matter of Stone*, 132 Iowa, 136, 140; *Mohn* v. *Mohn*, 148 id. 288, 300; *Darlington* v. *Darlington*, 160 Penn. St. 65; *Jackson's Appeal*, 126

id. 105; *Goss* v. *Singleton*, 39 Tenn. 67; *Mallott* v. *Wilson*, L. R. [1903] 2 Ch. 494.)

The court held (p. 426): " From the foregoing, we conclude that an acceptance should be presumed in this case, *which presumption may be overthrown by acts inconsistent with acceptance.*'

This brings us to the inquiry whether the acts or non-acts of the Mahlstedt corporation were effective as a refusal to accept the gift in its favor. In *Defreese* v. *Lake* (*supra*) it is in effect held that renunciation may be established by proof of acts inconsistent with acceptance. (*Albany Hospital* v. *Albany Guardian Society*, *supra*, 444.) Is this true in the instant case?

One of the modes for rejecting a gift is performance by the donee of acts which are inconsistent with the acceptance of the gifts. (*Amer. Church Mis. Soc.* v. *Griswold College*, 27 Misc. 42.) Assuming for argument that the stock control of the brothers and their trustees at testator's death was the control intended, the record is barren of any fact tending to show a resolution of acceptance by the corporation, or the payment of $10,000 per year to the widow, by dividend or otherwise, in any one of the years since the testator's death. Such payment did not have to be made as a dividend. It could have been, by resolution of the board of directors, paid out of undivided profits, surplus or annual income in performance of the condition annexed to the gift. Such payment has not been made for four years. The company has stood mute. It is a party to this proceeding and has failed to answer. The company cannot take the gift without accepting the conditions imposed by the testator. (*Beetson* v. *Stoops*, 186 N. Y. 456; *Matter of McGrath*, 129 Misc. 514; *Matter of Hughes*, 225 App. Div. 29; affd., 251 N. Y. 529; *Tillman* v. *Ogren*, 227 id. 495, 506.)

The recent case of *Oliver* v. *Wells* (254 N. Y. 451) in part had to do with a gift upon condition. At page 458, Chief Judge CARDOZO said: " ' One who accepts a benefit under a deed or will must adopt the whole contents of the instrument, conforming to all its provisions and renouncing every right inconsistent with it ' (*Havens* v. *Sackett*, 15 N. Y. 365, 369; *Beetson* v. *Stoops*, 186 N. Y. 456, 463). He is driven to a choice between the assumption of the burden and the rejection of the bounty. * * * The legacies and devises were acts of bounty merely. The testator was free to withhold that altogether, or to subject them to conditions, whether sensible or futile. The gift is to be taken as it is made or not at all (*Brown* v. *Knapp*, 79 N. Y. 136, 143; *Dinan* v. *Coneys*, 143 N. Y. 544, 547)." (*Allegheny Col.* v. *Nat. Chautauqua Co. Bank*, 246 N. Y. 369, 375.)

The rule rests upon the general principle of right, justice and fair dealing. (*Beetson* v. *Stoops, supra.*)

*Oliver* v. *Wells* (*supra*) also considered the question as to whether the parties had waited so long before accepting the gift that they must be held to have rejected it and so renounced the gift. The great chief judge further said: "The general principle is that election must be made within a time that is equitable in the light of the circumstances. This time may be very long, if injury to others will not result from the delay, and by the same token very short if the failure to act promptly may work injury or hardship (1 Pomeroy Equity Juris. [4th ed.] § 513; Halsbury Laws of England, title Equity, §§ 141, 144, and cases there collated)."

At page 460 he said: "There will be no revision by this court except for manifest abuse."

It is manifest that in four years the Mahlstedt Company had ample time and adequate opportunity to investigate the cost of the burden as compared with the value of the benefit. The instant case is one where the very short time for action has worked injury and hardship to the life tenant. The length of time to act is one of fact. I hold that the failure of the Mahlstedt corporation to act has caused its renunciation of the gift. Lack of acts is inconsistent with acceptance.

The testator certainly did not mean that his widow should be left in uncertainty as to the income upon the stock. He had no thought but that the recipients of his bounty would act at once. When it turns out that the gift has not been accepted, it remains in the original owner precisely as if the gift had not been made.

The effect of a renunciation or disclaimer, or *proof of non-acceptance*, is to remove the donee, from the very death of the testator, as a beneficiary under the will. His interest never became effective for any purpose. The bequest herein never took effect and title to it never vested. The gift lapsed. (*Matter of Meyer*, 137 Misc. 730.) The failure to pay so much per annum is cause to have shifted the legacy to somebody else.

The last question is: What becomes of the remainder interest? It is contended by the next of kin that it is intestate property.

Shall the original will with its gift to the widow be termed a residuary clause? No particular mode of expression is necessary to constitute a residuary legatee. It is sufficient if the intention of the testator be plainly expressed in the will that the surplus of his estate, after payment of debts and legacies, shall be taken by a person there designated. (*Morton* v. *Woodbury*, 153 N. Y. 243, 251.) While the residuary clause in wills is usually the last of its disposing provisions, still the mere fact that it is not the last

is not of controlling consequence, and can have no effect except as it bears upon the question of the intent of the willmaker.

" Residue " means all of which no effectual disposition is made by the will, other than by the residuary clause — what remains of testator's estate after deducting debts, bequests and devises. (Bouvier L. Dict. 2921.)   The gift of the entire estate in the original will, with the exception of the gift of stock created by the codicil, becomes a general residuary clause.   That the testator did not intend to die intestate as to any portion of his estate is entirely certain.

Where the residuary bequest is not circumscribed by clear expressions in the will, by words of unmistakable import, the residuary beneficiaries will take whatever may fall into the residue, whether by lapse, invalid disposition or other accident.   (*Riker* v. *Cornwall*, 113 N. Y. 115, 127; *Lamb* v. *Lamb*, 131 id. 227; *Matter of Miner*, 146 id. 121, 131; *Wright* v. *Wright*, 225 id. 329, 340; *Matter of Southmayd*, 124 Misc. 647; *Matter of Low*, 136 id. 532, 537, and cases cited.)

The presumption against intestacy is very strong and is applied in all cases.   (*West* v. *West*, 215 App. Div. 285.)   It is a familiar principle that partial intestacy is to be avoided when possible, and that a residuary clause of general terms ordinarily will be construed as covering lapsed or invalid legacies and devises, and is not to be restricted to property not governed by subsequent provisions, unless such intent on the part of the testator is clearly to be drawn from the remainder of the will.   (*Langley* v. *Westchester Trust Co.*, 180 N. Y. 326; *Matter of Allen*, 111 Misc. 93, 121; affd., 202 App. Div. 810; affd., 236 N. Y. 503.)   So anxious is the law to avoid intestacy that, where the language of a residuary clause is ambiguous, the courts will give it a broad rather than a restrictive interpretation so as to include such legacies.   (*Wright* v. *Wright*, 225 N. Y. 329, 340; *Matter of Cole*, 235 id. 48, 56.)

In my opinion, the remainder passed into the residuary estate under the general clause of gift of the original will to the widow.

Submit decision and decree in accordance with these views upon notice to all attorneys appearing.