In the Matter of the Estate of GEORGE GYLLSTROM, Also Known as KNUT GEORGE GYLLSTROM, Deceased.

Surrogate's Court, Kings County, November 24, 1939.

*Walter D. Frothingham* and *Julius Braunschweig*, for Hedwig Gnewuch, as executrix, etc., petitioner.

*Walter H. Pickett*, for Kay Gyllstrom, as executor, etc., petitioner.

*John E. Porte*, for Samuel Potter Brown, legatee.

*James Wilson Young*, for the Consul of Finland, as attorney in fact for Emilia Konstantia Jansson and Klas Gustaf Gyllstrom, residuary legatees.

*Emerson L. Simon* [*Alfred Buchter* of counsel], for Leo Thomas, claimant.

*A. I. Madison*, attorney *pro se*, claimant.

WINGATE, S. An interesting question of ademption is raised by the home made will of the present decedent which was executed on February 25, 1933, and by the addition thereto, dated December 22, 1933, to which the decedent prefixed the somewhat unique appellation of " *cuticle* to the second paragraph of this will." (Italics not in original.)

The decedent, who was a widower, died on February 18, 1935, at the age of sixty-nine years. He is described as a good business man but not keen in legal matters, which latter is deducible from the manner in which he attempted to dispose of his property on death. He was the owner of six parcels of real estate, five of which he attempted to transfer by deeds which he placed in his safe deposit box and which were to take effect on his death. According to the

indication of the present account, his personal property, as of the date of his death, exclusive of his business, which was specifically bequeathed to his secretary, was worth $24,901.17.

The will itself first gave his business to Anna R. Brannigan, next made the bequest which is the subject of the present controversy, then included detailed directions respecting the disposal of his remains, which consumed approximately as much space as all the remaining provisions of the document combined, and then directed that the residue be divided equally " betwin " a person in New Jersey, a nephew in Arizona " and my brother Klas Gustaf Gyllstrom in Helsingfort, Finland (if Klas is living) and my Syster Emelia Konstansia Jansson born Gyllstrom if my Syster Emelia would demice hurs share gos to hur children." It then appointed executors, one of whom was the New Jersey residuary legatee.

With this background, the second item of the will, and the " cuticle," which modified it alone, may be considered. The item itself reads:

" Second My executors shall adjust my savings in the Bank for Savings at 280 4th Ave., N. Y. City to. the amount of ($5,000) Five thousand Dollars and shall keep this money in this bank. Buster Brown Anderson Klow shall receive the interest of this money so long as he lives and shall receive the principal sum ($5,000.00) Five Thousand Dollars should he become a lawyer and be admitted to the bar as a Lawyer. If Buster Brown Anderson Klow should die before he is admitted to the bar as a lawyer then the ($5,000.00) Five Thousand dollars becomes the property of Hedwig Gnewuch, R. N. of Gladstone, N. J. And I hereby appoint nominate constitute Hedwig Gnewuch Guardian for Buster Brown Anderson Klow only for the ($5,000.00) Five Thousand dollars in the Bank for Savings at 280 4th Ave. N. Y. City."

The " cuticle " to this paragraph reads:

" I George Gyllstrom took part of the money from the Bank for Savings and bought Two hundred thousand (200,000.) Finland 7% Stadslan Av year 1922, obligation a 5000 Finska Marks 200,000 Finska Marks 000241/2-000263/3000 Serie A. for which Bonds I paid $5000.00.

" Buster Brown is to receive the coupons thereof twice a year. But should he become a lawyer and be admitted to the Bar he shall receive the Bonds. If the Bonds would be called and the money received from the Banks the money is to be placed in the Bank for Savings and Buster Brown shall receive the Interest thereof. The whole of the second Paragraph has not been changed, except that the money has been invested in Finland Republic Government Bonds.

" There is no more money to be placed in the Bank of Savings except what the bonds bring in when they are sold."

The real name of the beneficiary under these directions is Samuel P. Brown who was an infant nephew by marriage of the decedent, but was usually referred to by the latter by the name of Buddy, or that which was used in the will. The boy is lame and the record is replete with demonstrations of the testator's interest in him, and his desire to make provision for him " because Buddy was the way he was, he always felt sorry for him."

The two provisions which the testator attempted to make for his benefit were by the testamentary directions above noted, and by naming him as the grantee of one of the parcels of real estate, which consisted of a bungalow on Staten Island. In the latter connection, the testator is reported to have said: " I would like that boy to have this property because he is lame and the water at the beach would do him a great deal of good and I would like to see him have it."

The learned referee, Howard P. Nash, Esq., has held that the gift by deed was abortive by reason of its failure of delivery during the lifetime of the testator, and the court is reluctantly constrained to concur in this conclusion. The residuary legatees further assert that the other gift, under the will and codicil, must also fail by reason of its asserted ademption and this is the main present issue.

The facts relied upon by those contending for the complete disappointment of the wishes of the testator in respect of benefit of the boy, are, in part, reflected in the codicil. As demonstrated on the hearing, the transaction to which reference therein is made occurred on August 23, 1933, on which date the testator withdrew $4,575 from the account in the Bank of Savings, leaving $124.37 still on deposit. With this sum he purchased the five Finnish bonds to which he refers in the codicil. He had purchased three other like bonds, apparently on January 23, 1933, from his unearmarked individual funds.

He sold all eight of the bonds on October 26, 1934, for the net sum of $9,306.82, and on the following day deposited the check for this aggregate amount in his checking account with the Corn Exchange Bank Trust Company. Prior to such deposit this account showed a balance of $260.46. It may be observed parenthetically that excluding the month in which this deposit was made, the average monthly balance of the testator in this account for eight months from May, 1934, to January, 1935, which was the month of his death, was $279.49.

On November 12, 1934, the testator drew seven checks, numbers 3527 to 3533, inclusive, on his Corn Exchange account. These

were payable, $2,000 each to the City Savings Bank and the Williamsburg Savings Bank, and $1,000 each to the Excelsior, the Dime, the Bank for Savings, the Greenwich and the New York. No withdrawals were subsequently made by the testator from any of these accounts except from those in the City and the Greenwich Savings Banks, the former of which was completely exhausted and the latter reduced to a nominal sum. In other words, of the $9,000 deposited on November twelfth, of which $5,816.76 represented the *pro rata* receipt from the bonds which the codicil stated were dedicated to the legatee, $6,000 was placed by the testator in wholly inactive savings accounts and left undisturbed to the date of his death, whereas the two other accounts were used or exhausted by him for his own purposes. This appears to be more than a coincidence.

With this background of relevant facts, approach may be made to the question of whether the gift made by the will, as modified by the codicil, must be considered to have been adeemed by the dealings of the testator with the subject-matter.

As this court indicated in *Matter of Rubinstein* (169 Misc. 273, 277), in its somewhat more than passing consideration of the subject of ademption: " the determination of any issue of ademption of a specific testamentary gift involves two and only two inquiries, namely, *first*, as to the identity of the particular specified item which the testator purported to give; and, *second*, as to whether a thing answering to the description of such donated item belonged to him at the time of his death. The first question is purely one of the interpretation of the language purporting to effect the particular gift. The second is mainly a question of fact involving a comparison of the assets of which the testator died seized and possessed with the description of the item which was specifically given."

In approaching the task of deducing the devolutionary wishes of the testator as disclosed in his will, when this is read in the light of the circumstances surrounding him at the time of its execution, it is to be recalled that in the construction of a will prepared by a layman, the same meticulous precision of statement and description is not to be required as when the instrument is the result of expert draftsmanship, and that strict technical connotations of words and phrases are seldom applicable in the absence of a clear indication that the testator was aware of their precise meaning. (*Overheiser* v. *Lackey*, 207 N. Y. 229, 233; *Matter of Mahlstedt*, 140 Misc. 245, 248; modfd. on other grounds, 234 App. Div. 891; *Matter of Griffin*, 75 Misc. 441, 443; *Matter of Frank*, 153 id. 688, 690; *Matter of Bates*, 152 id. 627, 629.) " Of such a will, above all others, it is the duty of

the court to be astute in discovering and giving effect to the actual intent of the testator, as the same may be spelled out from the body of the instrument, read in the light of the surroundings and relations of the author, and the circumstances in which he was placed, and, so far as may be, unembarrassed by technical rules of construction." (*Lytle* v. *Beveridge,* 58 N. Y. 592, 598.) "A failure to use appropriate technical language, or a misapplication of legal terms, will not defeat an intention clearly manifested and sufficiently disclosed by an examination of the will itself." (*Bliven* v. *Seymour,* 88 N. Y. 469, 476.)

In the present instance the intention of the testator is wholly patent, and is in no wise controverted, that he desired to benefit this crippled lad, in whom he had manifested so great an interest, to the extent of the fund indicated in the second item of the will. The question is whether the language employed in the will is such that this obvious wish may be effectuated, or whether the testator's inexperience in such matters has caused him unwittingly to blunder into the toils of the doctrine of ademption.

The contesting parties should, it seems, be the more ready to palliate the lack of information of this lay testator for his apparent unfamiliarity with the intricacies of the law of testate devolution, since their own counsel have unanimously agreed upon a misconception of the nature of the initial gift in the second item of the will, designating it as "demonstrative" although all of their arguments are subsequently predicated on the theory that it is specific. As a matter of fact, were it demonstrative, as they assert, this legatee would clearly be entitled to his full gift. Unfortunately, however, it was clearly specific, since it pointed to a single source of solution only (*Matter of Smallman,* 138 Misc. 889, 897, 898, 903; *Davis* v. *Crandall,* 101 N. Y. 311, 319; *Crawford* v. *McCarthy,* 159 id. 514, 518, 521; *Matter of Armstrong,* 160 Misc. 806, 809; *Matter of Rubinstein,* 169 id. 273, 274, and authorities cited in these decisions), and not demonstrative (*Matter of Smallman,* 138 Misc. 889, 901; *Matter of Baker,* 146 id. 437, 440, 441), as authorizing payment from any assets of the estate indiscriminately in the event that the particular indicated fund proved inadequate for the solution of the gift.

As initially directed in the will, the gift was clearly of a benefit of $5,000 of the account of the testator in the Bank for Savings. As noted, the testator withdrew $4,575 from this account on August 23, 1933. If nothing further had occurred, the gift under the will must have been considered adeemed to the extent of the withdrawal. (*Matter of Rubinstein,* 169 Misc. 273, 275, 276; *Matter of Brann,* 219 N. Y. 263, 267.) That, even then, it would not have been

wholly adeemed is demonstrated by the fact that a part of the account was left intact on the withdrawal of a portion thereof and that in the codicil the testator expressly stated that he had taken only a part of the money which he had specifically given and that the legacy of the second item was not to be deemed changed in its entirety. In view of these facts, the $124.37, which yet remained in the account, was still subject to the devolutionary directions of item " second " of the will.

As hereinbefore noted, the sum withdrawn was invested in five Finnish bonds, to which the specific legatee could have laid no claim, as matters then stood. (*Matter of Ireland*, 257 N. Y. 155, 158; *Beck* v. *McGillis*, 9 Barb. 35, 58; *McNaughton* v. *McNaughton*, 34 N. Y. 201, 206; *Matter of Sinnott*, 163 App. Div. 817, 818; affd., 214 N. Y. 667; *Philson* v. *Moore*, 23 Hun, 152, 155.) The transaction, however, was not permitted to rest there. The testator executed his codicil in which he expressly substituted the five Finnish bonds which he had purchased with the money, in place of that which he had drawn. Had he died before the sale of the bonds, the infant would unquestionably have been entitled to their benefit.

The testator, however, did not stop at this point, but added: " If the bonds would be called and the money received from the Banks the money is to be placed in the Bank for Savings and Buster Brown shall receive the Interest thereof. The whole of the Second Paragraph has not been changed, except that the money has been invested in Finland Republic Government Bonds. There is no more money to be placed in the Bank of Savings except what the bonds bring in when they are sold."

Two matters appear to the court to be wholly obvious from this statement, so far as the intention of the testator is concerned. The first is that it was his expectation and wish that if the bonds should be " called " or " sold," which terms he apparently used with equivalent connotations, the proceeds " received from the banks " should be dedicated to the use of " Buster Brown " in like manner, and to the same extent, as if the bonds themselves were on hand at the time of his death. The direction for deposit in the Bank for Savings is not reasonably construable other than as a specification of the manner in which such proceeds should be invested by the fiduciary whom he designated for the purpose. Such directions were of a nature identical with that which he had included in the gift in the will.

The interpretation urged by the remaindermen who will, in any event receive more, in the form of the real estate, than the testator wished them to have, that the testator intended this specification of deposit to be directed against himself, is little short of an attempt

to convict him of being a moron. There was no need for him to direct himself as to what he should do with the proceeds. He was a free agent and, according to the record, a capable business man. There was, however, necessity for a direction as to the manner in which the proceeds should be invested by his chosen fiduciary.

The conclusion being obvious that the testator intended that the proceeds of the bonds purchased with the funds dedicated to the infant should be applied for his benefit, the sole remaining task concerns the tracing of such funds. On the demonstrated facts, this presents a minimum of difficulty. The bonds were sold on October 26, 1934, yielding a net sum of $5,816.76. This went into the testator's Corn Exchange account and on November twelfth was placed in five savings accounts, namely, those in the Williamsburg, Excelsior, Dime and New York Savings Banks and the Bank for Savings, with which accounts he subsequently refrained from any dealings whatsoever, leaving them intact up to the time of his death. The sums deposited in these banks unquestionably represent the proceeds of the bonds dedicated to the beneficiary and they are claimable for his use. (*Gardner* v. *Printup*, 2 Barb. 83.)

On the peculiar language of the will and codicil, it is conceivable that the same result might be attained on the theory adopted in *Prendergast* v. *Walsh* (58 N. J. Eq., 149, 153; 42 A. 1049) as explained in *Matter of Thompson* (217 N. Y. 111, 115). (See, also, *Matter of Rubinstein*, 169 Misc. 273, 282, 283.)

The court accordingly determines that the specific legatee is entitled to the benefit of the proceeds of the Finnish bonds purchased with the funds primarily dedicated to his use, amounting to $5,816.76 and also to the $124.37 left in the Bank for Savings upon the withdrawal of the larger amount, making a total of $5,941.13. The latter sum is a part of the existing account in the Bank for Savings. The former will be paid over, two parts from the Williamsburg Savings Bank and one each from the existing accounts in the Excelsior, Dime and New York Savings Banks and the Bank for Savings. These several sums are payable to Hedwig Gnewuch, as trustee, to deposit the sum with the Bank for Savings and to pay the income to Samuel P. Brown for life or until he shall be admitted to the bar. In the event of the happening of this condition, the principal is payable to him. In the event that he shall die without having complied with the condition, the principal will be payable to the trustee as an individual.

Since title to the specific gift passed on the death of the testator, it carries with it the *pro rata* interest earned by the accounts since the date of death.

There remains for consideration the determination of the learned referee respecting the sums properly allowable for the plethora of attorneys retained by the several executors. He has recommended the allowance of a total of $2,100. The gross assets of the estate, as appraised in the tax proceeding, totaled $40,465.79. The sum recommended is, therefore, slightly more than the five per cent which this court, in *Matter of Kentana* (170 Misc. 663), indicated was its estimate of the extreme limit of reasonableness for the settlement of an uncomplicated estate. This estate presented no complications in any reasonable connotation of the term. Had the coexecutors been co-operative instead of apparently working at cross purposes, a single attorney should have been able to close the entire matter with expedition instead of extending the administration for almost five years.

The only unusual features of the case, if they may be dignified by such an appellation, related to the attempt of the testator to make post mortuary gifts of his real estate, which any competent first year law student would recognize as ineffectual, and the question of abatement of the specific gift to the infant. The latter was not an issue in which the executors, as such, possessed any interest. They are legally, and should have been in fact, disinterested stakeholders. They probably would have been except for the fact that one of their number was a residuary legatee who stood to benefit substantially, as an individual, if the manifest wish of the testator in this regard could be thwarted. The efforts of his counsel to this end were rendered in his personal interest and cannot be made a basis for charge against the estate.

The court has reviewed the basis of the recommendations of the learned referee in this regard and concurs in his conclusion.

It follows that the report of the referee will be modified to the extent hereinbefore indicated but in all other respects will be confirmed.

Enter decree on notice in conformity herewith.