Arnold G-uy Fraiman, J.
This action for a declaratory judgment and specific performance involves the ownership of stock of a family-owned corporation known as Purofied Down Products Corporation (Purofied), as well as the ownership of certain real estate parcels. The latter issue was severed and a triál was had solely on the issue of the stock ownership. The parties to the action are the three Puro brothers, Arthur, Jacob and Louis, and the executors of the estates of their deceased brothers, Joseph, and Sam.
It was originally the position of Arthur and Jacob that all of the outstanding stock of Purofied belonged to a partnership known as Puro Bros., in which all five brothers were equal partners. Louis and the estates of Joseph and Sam, on the other hand, contend that the stock is owned by the brothers in varying amounts pursuant to a shareholders’ agreement dated May 1, 1951. The agreement recites that the stock of Purofied was held *951 by the brothers as follows: Louis, 262% shares; Sam, 262% shares; Jacob, 175 shares; Joseph, 175 shares; and Louis as trustee for Arthur, 125 shares. Summary judgment was granted in favor of Louis and the estates of Joseph and Sam on this issue on August 26, 1971, the court finding that the stock was owned pursuant to the stockholders’ agreement. However, on appeal, the order granting summary judgment was unanimously reversed and the matter remanded for trial on the ground that “the stock issue does not lend itself to determination on the papers submitted. ’ ’ Thereafter, Arthur and Jacob served a supplemental complaint in which they pleaded in the alternative, that if the court found that the stock was not owned by Puro Bros, but was held pursuant to the May 1, 1951 agreement, the court should declare that they had certain rights under that agreement, hereinafter discussed, and for specific performance thereof.
On the eve of the trial herein, Arthur and Jacob completely reversed the position they had maintained since the inception of this action in 1967, and abandoned their claim that the stock was owned by the Puro Bros, partnership. They now concede that the stock is owned pursuant to the May 1, 1951 stockholders’ agreement but, pressing the allegations contained in their supplemental complaint, they maintain that under that agreement they are entitled to exercise options to purchase their proportionate shares of the stock interests owned by the deceased brothers, Joseph and Sam, and they seek a declaratory judgment to that effect and specific performance thereof. Louis and the two estates maintain that Arthur’s and Jacob’s purported exercises of their options to purchase Joseph’s and Sam’s stock were ineffective in that they were conditional, and in the case of Sam’s stock, were untimely. Arthur also alleges that the trust referred to in the shareholders’ agreement, under which stock is held by Louis as trustee for Arthur, is invalid in that it is a dry or passive trust, and that he is therefore entitled to outright possession of whatever interest in Purofied Louis as trustee holds for him. This contention is vigorously disputed by Louis.
Finally, the executors of Joseph’s estate contend that the question of whether Arthur and Jacob effectively exercised their options to purchase Joseph’s stock must be determined in the Surrogate’s Court and not in this forum, pursuant to SOPA 1808 and 1810. With respect to this issue, it was agreed that the taking of testimony, which was relatively brief, would proceed in this court without prejudice to the position of Joseph’s *952 executors. In other words, if their position were sustained, the matter would be referred to the Surrogate’s Court for a trial de novo. Thus, this threshold issue must first be resolved before . considering the other matters referred to above.
Subdivision 1 of SCPA 1808 provides in relevant part: “ 1. Except as otherwise provided in 1810, whenever a fiduciary rejects a claim in whole or in part all issues relating to the validity and enforceability of the claim shall be tried and determined upon the judicial settlement of his account.” Section 1810 provides: “ Nothing in this article shall prevent a claimant from commencing an action on his claim at law or in equity, provided that where a claim has been presented and rejected in whole or in part the action must he commenced within 60 days after- such rejection.”
Simply stated, Joseph’s executors point out that Arthur’s and Jacob’s attempted exercise of their options, made by letter on November 4, 1970, was rejected by the executors on November 16, 1970. They contend that the letter of November 4, 1970 constituted a “ claim ” within the meaning of SCPA 1808 and 1810. Inasmuch as the supplemental complaint was not served until December 21, 1971, or. more than 60 days after the executors’ rejection of such “ claim ”, it is their position that Arthur and Jacob are time-barred by SCPA 1810 from litigating this issue in the Supreme Court. Instead, they contend that they are relegated to the Surrogate’s Court where the question will be resolved on the judicial settlement of the executors’ account.
If the attempted exercise of the options was a “ claim ” within the meaning of SCPA 1808 and 1810, the executors’ position would have merit. However, those sections relate to claims by creditors against an estate. (3 Warren’s Heaton, Surrogates’ Courts [6th ed.], § 270, par. 1.) They do not apply to claims to specific personal property in the possession of the estate. (Matter of Kellas, 38 N. Y. S. 2d 197.) That the instant action falls within the latter category is evidenced by the fact that the relief sought in the complaint is .for specific performance and not for money damages. Claims to specific personal property in the possession of a fiduciary are governed by SCPA 2105 and the remedies provided thereunder are separate and distinct from those contained in section 1808. (Matter of Kellas, supra.) Subdivision 1 of SCPA 2105 provides that “A person having a claim to specific money or personal property * * * alleged to be in the possession of * * * a fiduciary may present to the court from which letters were issued * * * a petition *953 showing the facts and praying that the fiduciary be required to show cause why he should not be required to deliver the specific money or personal property Despite the language of this section, it has been held that former section 206-a of the Surrogate’s Court Act, which was the predecessor to SCPA 2105, did not deprive the Supreme Court of concurrent jurisdiction to entertain such claims. (Bradley v. Roe, 257 App. Div. 1005, revd. on other grounds 282 N. Y. 525; Broder v. Broudarge, 38 N. Y. S. 2d 282.) Inasmuch as SCPA 1808 is inapplicable to the claims herein, they are governed, not by the 60-day Statute of Limitations contained in SCPA 1810, but by the period of limitations operative for SCPA 2105, that is, those contained in the Civil Practice Law and Rules. (Matter of Equitable Life Assur. Soc. of U. S. v. Branch, 32 A D 2d 959.) This being an action for specific performance, the applicable period of limitations is six years (CPLR 213). The supplemental complaint having been served well within that period, the court finds that the action is not time-barred.
Turning next to the question of whether the trust pursuant to which Louis holds Arthur’s stock is invalid in that it is dry or passive, the court concludes that it is a valid active trust. There is no dispute that Louis originally owned 50% of the common and preferred stock of Purofied. Some time at the end of 1945 or early 1946, Louis decided to set apart a 12%% interest in the company to be held by himself as trustee for the benefit of his younger brother, Arthur who was then approximately 21 years of age. Louis testified that a written agreement was prepared by his attorney, and Purofied’s books confirm the issuance of 125 shares of the common stock and 343% shares of the preferred to ‘1 Louis Puro, trustee for Aaron Arthur Puro [Arthur’s full name] ” on January 2,1946. At the trial, neither the original nor any copies of the written agreement were produced. Louis, the donor, testified that the lawyer who drew the agreement was dead, and that he had searched for a copy of the agreement but was unable to find one. The only testimony concerning the trust’s terms was given by Louis. He testified that, ‘ I know it [the agreement] said that I was going to be trustee during my lifetime and that any time that I felt during my lifetime that Arthur was matured enough, I could then, if I wanted to, give him the stock. I knew that I had to vote the stock at stockholders ’ meetings and that any dividends that I would get because of this stock, I would turn over to Arthur Puro.” No testimony was adduced to contradict this statement by the donor *954 concerning the terms of the trust, and the court finds that these were in fact its terms.
Arthur contends the trust was dry or passive because the trustee in fact had no actual duties to perform, and that therefore the legal as well as the beneficial interest in the stock vested directly in him as beneficiary. In support of this proposition, he relies principally upon EPTL 7-1.1 and 7-1.2; Matter of Bolton (195 Misc. 224); Matter of Mahlstedt (140 Misc. 245); Matter of Benjamin (139 N. Y. S. 2d 16) and Matter of De Rycke (99 App. Div. 596). In part he bases his case on the fact that no dividends were ever declared on the Purofied stock (the Puro brothers, including Arthur, instead receiving substantial salaries from the corporation) so that Louis, as trustee, never received or paid out any income. However, minutes of the stockholders’ meetings, though unsigned, indicate that Louis attended meetings both individually and as trustee, and voted the stock in those capacities. Moreover, on May 1, 1951, in his capacity as trustee for Arthur as well as individually, Louis entered into the stockholders’ agreement which is at the center of this controversy, and after the respective deaths of Sam and Joseph Puro, he formally attempted, in both capacities, to purchase the stock of the decedents pursuant to the stockholders’ agreement.
In any event, whether a trust is active or passive must be determined from the terms of the disposition or transfer, and not from the actions of the trustee. The failure of a trustee to produce the trust instrument or to perform his trust duties, or the circumstance that no dividends are declared cannot vitiate an otherwise valid trust. Here, the terms of the trust required Louis to pay over any dividends to Arthur, to vote the stock at stockholders’ meetings and to determine when the trust should be terminated. Whenever the trust’s terms direct the trustee to receive and apply or pay over[1] or accumulate[2] the income, the courts have consistently found a valid active trust. (Matter of Corin, 22 Misc 2d 699; Matter of Funk, 98 N. Y. S. 2d 786; Matter of Black, 33 N. Y. S. 2d 359, affd. 262 App. Div. 996; Brownson v. Gifford, 8 How. Prac. 389.)
*955 In those cases where the courts have found a passive trust there was no direction whatever to the trustee concerning income. The disposition was simply' ‘ in trust ” or to a named person ‘ ‘ in trust ” or “ for the use ” or “ benefit ” or “ maintenance and education ” of another person or persons where the trustee had no active duties to perform. (See, e.g., Jacoby v. Jacoby, 188 N. Y. 124; Matter of De Rycke, 99 App. Div. 596, supra; Matter of Lang, 23 Misc 2d 328; Matter of Sweeney, 155 Misc. 461.) In other cases where there were further instructions to the trustee, and the courts still found a passive trust, the additional language merely directed the trustee to pay over the trust assets at “ the age of twenty-one years ” or at some other specified time or circumstance, or implied that the “ trust ” was to terminate at such time, but contained no directives concerning the disposition of income. (Matter of Barrie, 25 Misc 2d 890; Matter of Bolton, 195 Misc. 224, supra; Matter of Mahlstedt, 140 Misc. 245, supra; Matter of Benjamin, 139 N. Y. S. 2d 16, supra; Matter of Miller, 115 N. Y. S. 2d 255.) For example, in Bolton (supra, p. 224) where the testatrix bequeathed certain stock “ to Mary Fleming * # * to be held in trust for her until she is twenty-one years of age and I hereby appoint Franz H. Armbruster * * * as trustee without bond ” the Surrogate stressed (p. 225): “ There is no reasonable basis for implying an intent that the trustee is to have any power or authority whatever in respect of income. Indeed, there is nothing in the record which would support the implication of an intent that the trustee is to do anything in respect to the shares except to hold them in trust.” Similarly, in Mahlstedt (supra, p. 250) the court said: “ There is no express gift to the executors and no direction for them to receive or apply the income.”
In the instant ease, having found that Louis had the duty to receive and distribute any income from the trust, in the form of dividends, which might have been paid, as well as certain other duties, the court holds that a valid active trust was created.
EPTL 7-1.1 and 7-1.2 do not require a different result. Those sections execute a dry or passive trust whenever the beneficiary is entitled to the “ possession ” of the property and to the income therefrom. Yet it was clearly Louis’ intent as donor that the right to possession of the stock was to be retained in himself as trustee, and that until “ matured enough ”, Arthur was. to have only the income therefrom.
Having concluded that Arthur’s stock is validly held in trust for him by Louis, Arthur’s attempted exercises of any stock options under the stockholders’ agreement following the deaths *956 of Sam and Joseph were clearly ineffectual, inasmuch as he was not a party to that agreement. However, the exercises of such options by Louis, in his own behalf, and as trustee for Arthur, as indicated by Louis’ letter of May 22, 1970 to the executor of Sam’s estate, and by his letter of October 14, 1970 to the executor of Joseph’s estate, were valid and effective, in both capacities, and the executors are required to comply therewith, pursuant to the terms of the shareholders ’ agreement.
This leaves undetermined the effectiveness of the exercise of Jacob’s options on the deaths of Sam and Joseph. As noted, it is contended by the estates and Louis that these were ineffectual in each instance on the ground that they were conditional, and in the case of the purported acceptance following Sam’s death, on the further ground that it was untimely. Resolution of these issues requires an analysis of the stockholders’ agreement. The parties to the agreement were Purofied and Louis, Sam, Jacob, Joseph and Louis as trustee for Arthur, who are described as the sole stockholders of Purofied. In relevant part, the agreement provides as follows: after setting forth the holdings of the individual stockholders, as indicated at the outset herein, it states that it was the intention of the parties that Purofied’s business be conducted as a closed corporation and that none other than the named stockholders should be interested in its profits or management. The parties then agree that so long as the individuals are stockholders, they will elect themselves and Arthur as the officers and directors of Purofied (par. second). Next, the stockholders agree not to sell their stock to outsiders before offering it to other stockholders (par. third), who have 60 days in which to accept the offer (par. fifth). The purchase price is fixed at book value (par. seventh) . The agreement then provides (par. fourteenth), “ That upon the death of any Stockholder, the other Stockholders, who then may be the Stockholders of the Corporation and parties to this agreement, must purchase the shares of the stock of the Corporation owned or held by the stockholder so deceased, and pay for same in the following manner: Fifty (50%) per cent of the purchase price thereof in 36 equal monthly installments after the date of death of such deceased Stockholder, and the balance in equal quarter-annual payments over a period of fifteen (15) years thereafter. The death of a stockholder shall be construed and deemed as an offer to sell by such stockholder at the date of his death, and payment shall be made as provided for herein; and the terms * * * of this agreement shall mutatis mutandis, *957 apply to and govern the personal representative or representatives of such deceased stockholder.’’ (Italics added.)
Sam died on April 25, 1970. Thereafter, on July 20, 1970, Jacob sent the following letter by certified mail to Louis, who was president of Purofied, with copies to the executor of Sam’s estate and to Joseph and Arthur:
‘ ‘ Dear Lou:
“ In reply to your letter to me of May 22, 1970 wherein you accepted, individually and as trustee for Arthur Puro, the offer implied by Sam’s death to purchase the pro-rata shares of his stock in Purofied Down Products Corporation pursuant to an agreement dated May 1, 1951, among all the brothers Puro except Arthur, I would like to remind you that you are not a stockholder of Purofied Down Products Corporation and that Puro Bros., is the sole stockholder of said corporation and has been since January 4,1966, when said stock was issued pursuant to the partnership agreement, dated March 1, 1956, among all the brothers Puro.
‘ ‘ In the event that the Courts should decide otherwise in the pending partnership dissolution, liquidation and accounting action in the Supreme Court, New York County, I hereby accept, without prejudice, the offer implied by Sam Puro’s death to purchase my share of his stock in Purofied Down, as amended by said partnership agreement and the brothers Puro.
“ Very truly yours,
“ Jacob Puro ”
Following Joseph’s death on September 22, 1970, Jacob sent a similar letter to the executor of his estate on November 4,1970, purporting to exercise his option to purchase Joseph’s stock.
As noted, Jacob and Arthur had consistently maintained right up to the eve of the trial of this action on January 25, 1972 that the stock of Purofied was owned by Puro Bros, pursuant to a partnership agreement which they claimed superseded the May 1, 1951 stockholders’ agreement. At the commencement of the trial, they abandoned this position, and conceded that the stockholders’ agreement was controlling in determining their interest in Purofied.
Louis and the executors maintain that Jacob’s reaffirmation in his letters of July 20 and November 4 that the stock of Purofied was owned by Puro Bros, nullified his attempted acceptance of the offers to purchase the stock of his deceased brothers. In support of their position they rely upon the well-established principle of contract law that in order for an acceptance to be valid, it must be unconditional, unqualified, and comply *958 fully with the terms of the offer, and if it does not, it is in effect a counteroffer, and therefore a rejection of the original offer. (1 Williston, Contracts [3d ed.], §§ 51, 60, 72, 77; Valashinas v. Koniuto, 308 N. Y. 233; Gram v. Mutual Life Ins. Co. of N. Y., 300 N. Y. 375; Winslow v. Moore, 30 Hun 311.) However, that principle is inapposite to the facts herein. Here, the acceptance by Jacob was conditioned only by the finding of a court that the agreement was still in effect, a position contrary to the one he was then taking in the pending litigation. In other words, he was reserving his legal rights under the stockholders ’ agreement in the event the court found against him. His acceptance complied fully with the terms of the offer and was conditional only in the sense that it was dependent upon the court’s finding that the stockholders’ agreement pursuant to which the offer was made was valid. This he was entitled to do. (Orr v. Doubleday, Page & Co., 223 N. Y. 334.) His action was analogous to the purchaser of real property who accepts an offer to sell, subject to the condition that title is good. Such an acceptance is clearly valid. (1 Williston, Contracts [3d ed.], § 78.) Nor would there be any rationale for holding otherwise if at the time of the offer to sell a third person or the purchaser himself was challenging the seller’s title to the property. Jacob’s abandonment of his position that the stock is owned by Puro Bros, and his concession that ownership is governed by the stockholders’ agreement is tantamount to the court’s finding to that effect. The agreement being valid, so too are Jacob’s acceptance of the offers to sell deemed to have been made at the deaths of Sam and Joseph. To hold otherwise would have the unnecessarily harsh effect of compelling Jacob to elect whether to accept his rights under the stockholders’ agreement and give up his challenge addressed to its validity, or forever abandon such rights and pursue his partnership theory in the courts. No sound policy reasons exist for compelling such a choice. Accordingly, the court finds that Jacob’s acceptance of the offers to purchase the stock of Sam and Joseph from their estates was not ineffective because of the form of the acceptance.
With respect to the. timeliness of Jacob’s exercise of his option to purchase Sam’s stock, Sam died on April 25, 1970, and Jacob’s letter of acceptance of the offer to sell, deemed to have been made on that date, was sent on July 20, 1970, some 85 days thereafter. Louis and the estates argue that this was untimely because any such acceptance had to be made within 60 days under paragraph fifth of the agreement. Jacob, on the other hand, contends that paragraph fifth is applicable only to those *959 instances where a living stockholder wishes to dispose of Ms stock, and not to the case of the purchase of stock from a deceased stockholder, which is governed exclusively by the terms of paragraph fourteenth. The court agrees with the latter interpretation. Paragraph third of the agreement declares that no stockholder shall sell his stock to an outsider before offering it to the other stockholders. Paragraph fourth states that “ every such offer shall be in writing ”, and paragraph fifth provides that “ the stockholders to whom such offer must he made as hereinabove provided, shall have a period of sixty (60) days from the time of the delivery or mailing to them of the said offer to accept or reject the same ”. (Italics added.) Paragraph ninth (a) provides that “ the stock offered shall be so offered * * * in the same proportions as [the other stockholders] hold stock * * * and in the event any one or more * * * refuse to purchase the stock so offered * * * the remaining stockholders * * * shall have the privilege of purchasing all of the stock so offered in the same proportions in which they hold stock in the said Corporation. If * * * all of the stockholders shall reject * * * the offer * * * , then * * * it shall be compulsory for all of the stockholders to purchase the stock so offered in the proportions in which they hold stock in the said Corporation.”
Thus, paragraph ninth (a) provides an alternative for a stockholder who does not wish to purchase a proportionate share of the stock of another living stockholder: he may reject the offer, and in the event the other stockholders pick up his share, he is relieved of any obligation to buy. He is required to purchase Ms proportionate share only in the event “ all of the stockholders shall reject * * * the offer ”. However, paragraph fourteenth furnishes no such alternative. Under that provision, where a stockholder dies, the other stockholders “ must purchase the shares of the stock of the corporation owned or held by the stockholder so deceased ”. (Italics added.) The language of this provision being mandatory, the surviving stockholders, Louis, individually and as trustee for Arthur, and Jacob, were required to purchase the stock of Sam and Joseph, and the 60-day option period provided for in paragraph fifth has no applicability.
It should be noted that this interpretation of the agreement furnishes still another ground for the disposition of the issue of whether Jacob’s acceptances were conditional, inasmuch as under this interpretation Jacob had no alternative but was required to purchase the stock.
*960 For all of the foregoing reasons, Jacob, and Louis as trustee for Arthur, as well as in Louis’ own behalf, are entitled to purchase proportionate shares of the stock of Sam and Joseph from their executors. The effect of such purchases would give Louis, individually, 467.62 shares, Jacob 310.75 shares, and Louis as trustee for Arthur, 221.63 shares.
During the pendency of the appeal from the grant of summary judgment in this case, the court, on October 29, 1971, with the consent of all parties, appointed a monitor to supervise the operations of Purofied and installed an interim management for the corporation. When the Appellate Division handed down its decision sending the matter back for trial, the court on December 17,1971, on application of one of the parties, appointed a temporary receiver for the stock of the corporation. This was necessary in the court’s opinion because it was unclear which faction was entitled to control and operate the corporation, and it was apparent from affidavits submitted to the court and statements by counsel that neither faction could be trusted with the operation of the company without seriously jeopardizing the rights and interests of the other faction. Ownership of the stock has now been determined. If the controlling stockholders act in a manner contrary to the interests of the minority stockholders, the adversely affected stockholders may take whatever legal action is appropriate. Accordingly, no reason exists for the continuation of the receivership and it shall be terminated upon the entry of judgment herein. However, the judgment shall not take effect until 20 days after entry thereof to provide any party an opportunity to seek a stay from the Appellate Division,

. Even as to trusts of real property which, prior to 1965, could be created only for purposes permitted by section 96 of the Real Property Law, trusts to receive and “pay over” rents and profits were authorized by subparagraph 3 of section 96 which was stated in terms of “ to receive * * * and apply ”. (See 4 Powell, Real Property [1971 ed.], If 519, p. 132 and cases there cited.)

. Since Arthur had reached his majority, a direction to accumulate income would have been prohibited by section 16 of the Personal Property Law at the time the trust was created,